**UNITED STATES of America, ex rel. Donald E. HOWARD, et al., Plaintiffs and Relators,**

v.

**LOCKHEED MARTIN CORPORATION, Defendant.**

**Case No. 1:99–cv–285.**

United States District Court, S.D. Ohio, Western Division.

Filed March 25, 2014.

Michael F. Hertz, Russell B. Kinner, U.S. Department of Justice, Washington, DC, Matthew Joseph Horwitz, United States Attorney's Office, Jennifer M. Verkamp, Morgan Verkamp LLC, Cincinnati, OH, Mike Bothwell, Julie K. Bracker, Bothwell Bracker, PC, Roswell, GA, Stephen T. LaBriola, Kevin Weimer, Fellows LaBriola LLP, Atlanta, GA, for Plaintiffs and Relators.

Christopher C. Burris, Edward T. Logan, Jessica J.M. Hagen, King and Spalding, Atlanta, GA, Glenn Virgil Whitaker, Jacob D. Mahle, Victor A. Walton, Jr., Vorys, Sater, Seymour and Pease LLP, Cincinnati, OH, for Defendant.

Order (1) Granting in Part and Denying in Part Relators' Motion for Partial Summary Judgment and (2) Granting in Part and Denying in Part Defendant's Motion for Summary Judgment

SUSAN J. DLOTT, Chief Judge.

This matter is before the Court on Plaintiffs' and Relators' Motion for Partial Summary Judgment (Doc. 249) and Defendant's Motion for Summary Judgment (Doc. 256). This False Claims Act lawsuit concerns the development and production of the United States Air Force's F–22 aircraft by Defendant Lockheed Martin Corporation. Relators Donald E. Howard, Larry W. Wilson, Charles Harrison, and Morris Moss are current or former employees of Lockheed. Relators allege generally in this lawsuit that the vendor-supplied tooling program for the F–22 aircraft program was deficient, leading to the submission of false claims for payment by Lockheed to the United States.

## I. INTRODUCTION AND FACTUAL OVERVIEW

In April 1991, Defendant Lockheed, the lead contractor on a team with other contractors, won an Air Force competition for the opportunity to build the Air Force's new Advanced Technical Fighter, which eventually became the F–22. (SOF–R ¶ 16–17.)[1] The Air Force described the F–22, sometimes referred to as the F–22 Raptor, on a public factsheet dated September 6, 2005 as follows:

> The F–22 Raptor is the Air Force's newest fighter aircraft. Its combination of stealth, supercruise, maneuverability, and integrated avionics, coupled with improved supportability, represents an exponential leap in warfighting capabilities. The Raptor performs both air-to-air and air-to-ground missions allowing full realization of operational concepts vital to the 21st century Air Force.

(U.S. Air Force, http://www.af.mil/About Us/FactSheets/Display/tabid/224/Article/

---

1. SOF–R is Relators' Response to Lockheed's proposed Statement of Facts ("SOF") and is filed at Doc. 268.

104506/f–22–raptor.aspx (Feb. 26, 2014).) Franklin Carey, the contracting officer on the F–22 program for the Government's Defense Contract Management Agency ("DCMA"), described the project as "exceeding the envelope of known technology" in the areas of "[r]adar evading, fuel efficiency, and some electronic and engine." (Doc. 309–1, Carey Dep. 11.)

The F–22 program began as an "engineering/manufacturing/development" ("EMD") program. (SOF–R ¶ 19.) The EMD portion of the F–22 program was contracted on a "cost plus award fee" basis. (SOF–R ¶ 20.) Federal Acquisition Regulations ("FARs") permit the use of cost-reimbursement contracts when the government agency cannot "define its requirements sufficiently" or estimate its costs "with sufficient accuracy" to allow use of a fixed-price contract. 48 C.F.R. § 16.301–2(a). Pursuant to the EMD Contract, the Air Force paid Lockheed for allowable costs incurred in the development of the F–22 plus a fixed fee of approximately 4% of the costs incurred. (CSOF–R ¶ 86; CSOF Ex. 24, Burbage Dep. 58.)[2] At the discretion of the Government, Lockheed could earn an additional fee of approximately 9% of the cost. (CSOF–R ¶ 87; CSOF Ex. 24, Burbage Dep. 58.)[3] One explicit factor in the award fee consideration was "[o]verall [c]ost [c]ontrol." (CSOF–R Ex. 43 ¶ IV.B.1.) Kendra Riney, Lockheed's contracting director, stated in a written declaration that "increased costs impacted the Program's budget and could result in a smaller fee award to Lockheed Martin." (SOF Ex. 2, Riney Dec. ¶ 7.)[4] Vouchers for payment which Lockheed submitted to the Government contained a certification that the costs were applicable, allocable, and reasonable, a standard consistent with FAR 31.[5] (CSOF Ex. 37, Haase Dep. 123–24, 181–87.)

Carey, the DCMA contracting officer, stated that the F–22 program was a "concurrent design/build program" which meant that "as [Lockheed] was designing and building one aircraft, the engineering on the following aircraft would continue to evolve and change." (SOF–R ¶ 28; SOF Ex. 15, Carey Dec. ¶ 10.) Lockheed delivered the first F–22 aircraft to the Government on August 8, 1997 pursuant to the EMD Contract. (SOF–R ¶ 149.)

In 1998, Lockheed and the Government entered into a Production Representative Test Vehicle ("PRVT") Contract, a firm fixed price contract for a total of eight aircraft. (SOF Ex. 2, Riney Dec. ¶ 8.)

---

**2.** CSOF is Relators' Counter–Statement of Facts and is filed at Doc. 268. CSOF–R is Lockheed's Response to the Counter–Statement of Facts and is filed at Doc. 293.

**3.** At the summary judgment hearing, counsel for Lockheed told that the Court that Lockheed did not have a cost-plus-percentage-of-cost award fee system with the Government. (Doc. 328 at PageID 28440–41.) Counsel did not identify a specific citation to the evidentiary record for support of that assertion nor did he address Lockheed's contrary assertion in the written briefs.

**4.** SOF is Lockheed's proposed Statement of Facts and is filed at Doc. 256–1.

**5.** FAR 31.201–2(a) states as follows: "A cost is allowable only when the cost complies with all of the following requirements: (1) Reasonableness. (2) Allocability. (3) Standards promulgated by the CAS Board, if applicable, otherwise, generally accepted accounting principles and practices appropriate to the circumstances. (4) Terms of the contract. (5) Any limitations set forth in this subpart." 48 C.F.R. § 31.201–2(a). Additionally, FAR 31.201–3 provides that reasonableness "depends upon a variety of considerations and circumstances, including ... Federal and State laws and regulations." (48 C.F.R. § 31.201–3(b)).

The parties executed the first fixed-price production contract, the Lot 1 Production Contract, in December 1999, but the EMD phase of the F–22 program did not end until 2002. (SOF–R ¶ 37; SOF Ex. 15, Carey Dec. ¶¶ 17, 20.) Lockheed and the Government entered into eight Production Contracts between December 1999 and November 2008. (SOF Ex. 2, Riney Dec. ¶ 10.) The Air Force procured 178 F–22 aircraft pursuant to the Production Contracts. (*Id.*)

Pursuant to the EMD and the Production Contracts, the Government accepted delivery of the F–22 aircrafts pursuant to the DD–250 process. (SOF Ex. 2, Riney Dec. ¶¶ 13–14; SOF Ex. 15, Carey Dec. ¶ 16.) Lockheed's contract director testified that "[t]he DD–250 process establishe[d] the Government's acceptance of the aircraft and determines that the aircraft complies with contract requirements." (SOF Ex. 2, Riney Dec. ¶ 14.) The DD–250 forms contained notations indicating any variances, corrective actions, and money withholdings. (Docs. 266–2, 266–3.)

On April 18, 2007, Lockheed and the Air Force entered in Contract Modification No. P00671 to the F–22 EMD contract. (SOF Ex. 2, Riney Dec. ¶ 21.) The Contract Modification stated that the "performance of the [EMD Contract] is deemed completed." (*Id.,* Riney Dec. Ex. B.)

## II. PROCEDURAL HISTORY

On April 21, 1999, Relators Donald E. Howard and Larry W. Wilson filed the original Complaint (Doc. 3) in this case against Defendant Lockheed alleging violations of the False Claim Act ("FCA"), 31 U.S.C. § 3729 *et seq.* The Complaint was filed under seal. The United States began an investigation into the Relators' allegations for the purpose of determining whether to intervene in the action pursuant to 31 U.S.C. § 3730(b). On June 11, 2003, Relators filed an Amended Complaint (Doc. 25).

While this case was in its initial proceedings, Relators Charles Harrison and Morris Moss filed a separate suit alleging FCA violations against Lockheed on January 15, 2002 in the Northern District of Georgia. *Harrison v. Lockheed Martin Corp.,* No. 1:02–cv–118, Dkt. 1 (N.D.Ga. Jan. 15, 2002). The Government became aware of both suits and, upon leave of this Court and of the Northern District of Georgia, informed each set of Relators about the existence of the other. Harrison and Moss then moved to dismiss the second-filed suit. The Northern District of Georgia granted the dismissal motion on February 23, 2005. *Harrison,* No. 1:02–cv–118, Dkt. 36 (N.D.Ga. Feb. 23, 2005).

On May 13, 2005, Relators Howard and Wilson moved for leave to file a Second Amended Complaint in this first-filed suit to join in Relators Harrison and Moss. (Doc. 38.) The Government did not oppose the addition of Harrison and Moss to this suit. (*Id.*) The Court granted leave to amend, and Relators filed the Second Amended Complaint against Lockheed on that same day. (Docs. 39, 40.)

On October 5, 2006, the Government formally declined to intervene in this case. (Doc. 61.) The Second Amended and Consolidated Complaint was unsealed and served on Lockheed in early 2007. (Docs. 62, 63.)

On March 13, 2007, Lockheed moved to dismiss the Second Amended Complaint. (Doc. 65.) The Court dismissed the Second Amended Complaint in part to the extent that Counts I and II were based on 31 U.S.C. § 3729(a)(1) because Relators had failed to plead the element of presentment with particularity. (Doc. 88.) How-

ever, the Court granted Relators leave to move to amend if warranted after discovery. (*Id.*) Following discovery, Relators moved for leave to amend, and the Court granted Relators leave to amend. (Docs. 227, 241.) On January 31, 2012 Relators filed the Third Amended Complaint reinstating the 31 U.S.C. § 3729(a)(1) claims. (Doc. 244.) The Third Amended Complaint incorporated by reference the allegations and causes of action stated in the Second Amended and Consolidated Complaint. (*Id.*)

Relators pleaded the following causes of action in the Third Amended Complaint:

Count I: False Claims Act violations under 31 U.S.C. § 3729(a)(1) and (a)(2);

Count II: False Claims Act conspiracy in violation of 31 U.S.C. § 3729(a)(3);

Count III: Retaliation against Relator Donald Howard in violation of 31 U.S.C. § 3730(h); and

Count IV: Retaliation against Relator Larry Wilson in violation of 31 U.S.C. § 3730(h).

(Doc. 40–4 at PageID 410–14.) Relators have not pursued the conspiracy claim and the Court considers it to have been withdrawn. (Doc. 267 at PageID 11638.)

Relators and Lockheed both have moved for summary judgment. Lockheed has moved for summary judgment on Relators' claims for FCA substantive violations and for FCA retaliation. Relators have moved for summary judgment on Lockheed's affirmative defenses of waiver, estoppel, and accord and satisfaction. Briefing on the motions is complete. On July 3, 2013, after the completion of the briefing, the United States filed a Statement of Interest pertinent to the pending motions. (Doc. 312.) The parties' summary judgment briefs totaled more than 300 pages. In addition, the parties submitted over 900 paragraphs of proposed undisputed facts and thousands of pages of exhibits.

The Court scheduled oral arguments on the summary judgment motions for August 29, 2013. The parties estimated that the hearing would take less than one day to complete. However, the hearing spanned three non-consecutive days on August 29, August 30, and September 20, 2013. Relators presented new arguments and revised theories of liability at the hearing. Lockheed responded in kind. The parties together introduced hundreds of pages of new exhibits in conjunction with the summary judgment hearing. (Docs. 345, 346, 351, 352.) While the hearing brought some factual disputes and legal issues into sharper focus, it expanded the breadth of summary judgment matters to be adjudicated. The judicial trope that "the matter is ripe for adjudication" is accurate, but seems inadequate to describe the work expended on the pending Motions.

## III. LEGAL STANDARDS

### A. Elements of an FCA Fraud Claim

The False Claims Act statutory language in effect when this case was initiated provided in relevant part as follows:

(a) Liability for certain acts.—Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; [or]

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

\* \* \* \*

... is liable to the United States Government for a civil penalty....

31 U.S.C. § 3729(a) (pre–2009 amendments).

The FCA was amended by the Fraud Enforcement and Recovery Act ("FERA") on May 20, 2009. Section 3729(a) was amended in relevant part as follows:

(a) Liability for certain acts.—

(1) In general. . . . [A]ny person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

. . . is liable to the United States Government for a civil penalty. . . .

31 U.S.C. § 3729 (as amended in 2009).

FERA explicitly states that amended § 3729(a)(1)(B) applies retroactively to claims pending on or before June 7, 2008. The other relevant amendments to § 3729(a) are not retroactive. *See* 2009 Acts. Pub.L. 111–21, § 4(f), May 20, 2009, 123 Stat. 1625. On November 2, 2012, the Sixth Circuit held that the term "claim" in the retroactivity provision "refers to a civil action or case." *U.S. ex rel. Sanders v. Allison Eng. Co. Inc.*, 703 F.3d 930, 942 (6th Cir.2012). The Court also held that "the retroactive application of the FCA does not violate the Ex Post Facto Clause's prohibition on retroactive punishments." *Id.* at 948. Accordingly, the relevant statutory provisions which Relators have alleged were breached by Lockheed are 31 U.S.C. § 3729(a)(1) (pre–2009 amendments) and 31 U.S.C. § 3729(a)(1)(B) (post–2009 amendments).[6]

 "Section 3729(a)(1) imposes liability not for defrauding the government generally; it instead only prohibits a narrow species of fraudulent activity: 'present[ing], or caus[ing] to be presented, . . . a false or fraudulent claim for payment or approval.'" *U.S. ex rel. Bledsoe v. Community Health Syss., Inc.*, 501 F.3d 493, 504 (6th Cir.2007) (citation omitted). Liability does not arise under § 3729(a)(1) "merely because a false statement is included within a claim, but rather the claim itself must be false or fraudulent." *U.S. ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 443 (6th Cir.2005). Therefore, "a false statement within a claim can only serve to make the entire claim itself fraudulent if that statement is material to the request or demand for money or property." *Id.; see also U.S. v. United Techs. Corp.*, 626 F.3d 313, 321 (6th Cir.2010) (citing *A+ Homecare*). "[A] false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *A+ Homecare*, 400 F.3d at 445 (citation omitted). A cause of action under § 3729(a)(1) also requires proof that the false statement or claim was presented to the Government. *U.S. ex rel. Marlar v. BWXT Y–12, L.L.C.*, 525 F.3d 439, 445 (6th Cir.2008).

 "To establish a post-FERA claim for relief under § 3729(a)(1)(B), the relator must allege that the defendants knowingly made or used, or caused to be made or used, a false record or statement material to a false or fraudulent claim." *U.S. ex rel. Dennis v. Health Mgmt. Assocs., Inc.*,

---

**6.** At the summary judgment hearing, attorneys for Lockheed agreed, and the attorneys for Relators did not object, when the Court concluded that § 3729(a)(1) (pre–2009 amendments) and § 3729(a)(1)(B) (post–2009 amendments) were applicable. (Doc. 327 at PageID 28393, 8/29/13 Tr.) Both parties have stated that the changes in § 3729(a)(1)(B) are not material to the issues in this case. (Doc. 256 at PageID 10152 n. 38; Doc. 267 at PageID 11590 n. 3.)

No. 3:09–cv–00484, 2013 WL 146048, at *17 (M.D.Tenn. Jan. 14, 2013). The term "material" is defined in the FERA amendments to the FCA to mean "having a tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

An FCA violation requires scienter, but not proof of intent to defraud. *U.S. ex rel. Wall v. Circle C Constr., L.L.C,* 697 F.3d 345, 356 (6th Cir.2012). A showing of an aggravated form of gross negligence or reckless disregard will satisfy the scienter requirement. *Id.* However, "[s]imple negligence and innocent mistakes do not meet the level of scienter required by the FCA." *U.S. v. Estate of Rogers,* No. 1:97CV461, 2001 WL 818160, at *3 (E.D.Tenn. June 28, 2001). An FCA false claim must "betray or suggest intentional deceit." *U.S. ex rel. Roby v. Boeing Co.,* 100 F.Supp.2d 619, 626 (S.D.Ohio 2000) (citations omitted). "[E]rrors based upon flawed reasoning and differences in interpretation of disputed legal questions are not false under the FCA." *U.S. ex rel. Augustine v. Century Health Servs., Inc.,* 136 F.Supp.2d 876, 890 (M.D.Tenn.2000). Likewise, an FCA violation requires "proof of an objective falsehood." *Roby,* 100 F.Supp.2d at 625. "Expressions of opinion [or] scientific judgments" will not suffice. *Id.*

The so-called "square corners" rule applies in the FCA context. *U.S. ex rel. Compton v. Midwest Specialties, Inc.,* 142 F.3d 296, 302 (6th Cir.1998). "[P]arties that contract with the government are held to the letter of the contract—irrespective of whether the contract terms appear onerous from an *ex post* perspective, or whether the contract's purpose could be effectuated in some other way—under the maxim that men must turn square corners when they deal with the Government." *Id.*

Moreover, "the mere fact that the item supplied under contract is as good as the one contracted for does not relieve defendants of liability if the item does not in fact conform to the express contract terms." *Id.* at 302 n. 4 (citations omitted). Accordingly, "the failure to comply with government contract specifications can result in an FCA 'injury' to the government, even if the supplied product is as good as the specified product." *Varljen v. Cleveland Gear Co.,* 250 F.3d 426, 430 (6th Cir.2001) (finding that relators had stated an FCA claim when they alleged that defendant changed the manufacturing process in violation of an express "quality assurance requirement" that manufacturing processes stay consistent with the process that achieved the first approved product).

"The False Claims Act does not require an expressed false statement to establish liability, but rather, liability may be premised on claims for payment if such claims incorrectly represent that the contracted-for services conform to the terms and specifications of the contract." *U.S. ex rel. Tetsuwari v. Fluor Fernald, Inc.,* No. 1:06–CV–00235, 2010 WL 1849324, at *2 (S.D.Ohio May 5, 2010). "A false statement can be shown to have been made by an express false certification, or through the so-called implied certification theory, which holds a defendant liable for violating the continuing duty to comply with the regulations on which payment is conditioned." *Wall,* 697 F.3d at 356 (internal quotations and citation omitted). The Sixth Circuit has held that a defendant is liable for violating the FCA, even if the claim for payment was not false or fraudulent when made, if the defendant violates a continuing duty to comply with the regulations upon which a payment is conditioned. *See A+ Homecare,* 400 F.3d at 454 n. 20. Permitting claims based on implied certification does not vitiate the FCA's scienter

requirement because in such cases the relator still must prove that "the contractor knew, or recklessly disregarded a risk, that its implied certification of compliance was false." *Augustine v. Century Health Services, Inc.*, 289 F.3d 409, 416 (6th Cir. 2002).

Regarding the duty to comply with regulatory provisions, the Sixth Circuit explained that "[t]he False Claims Act is not a vehicle to police technical compliance with complex federal regulations." *U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 532 (6th Cir.2012). In *Williams*, the Sixth Circuit cited with approval cases which held that a false certification of compliance with regulations is only an FCA violation if the certification of compliance was a prerequisite or condition of payment. *Id.* (citing *U.S. ex rel. Gross v. AIDS Research Alliance–Chicago*, 415 F.3d 601, 604 (7th Cir.2005) and *U.S. ex rel. Landers v. Baptist Mem'l Health Care Corp.*, 525 F.Supp.2d 972, 978–79 (W.D.Tenn.2007)). The Sixth Circuit reaffirmed that FCA liability only attaches for false certifications of compliance with conditions of payment in *U.S. ex rel. Hobbs v. MedQuest Assocs., Inc.*, 711 F.3d 707, 714 (6th Cir.2013).

 Damages do not need to be proved to establish FCA liability. *U.S. ex rel. Hagood v. Sonoma Cty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir.1991); *United States v. Killough*, 848 F.2d 1523, 1533–34 (11th Cir.1988).

**B. Applicable Contract Provisions and Regulations**

Lockheed's relationship with the Government for the F–22 Program was governed by a variety of contractual documents, including the EMD Contract, Attachments to the EMD Contract, the EMD Contract Statement of Work, Quality Assurance Plans ("QA Plans"), industry standards governing quality assurance ("QA Standards") incorporated into the contractual documents, and Federal Acquisition Regulations. Relevant provisions from the contract documents, QA Standards, and FARs are set forth in the analysis below where appropriate. A few points about the governing documents are addressed here to provide context for the FCA claims analysis that follows.

The EMD Contract Statement of Work in § 3.4.2.5 called for the implementation of QA Standard MIL–Q–9858 and MIL–STD–1535A. (CSOF–R ¶ 76; SOF Ex. 38.) It required Lockheed to "take corrective action for nonconformances and deficiencies in accordance with tailored MIL–STD–1520C." (*Id.*) It also required Lockheed to "implement a system [to] continually reduce nonconformances and their associated costs and take corrective action to prevent recurrences." (*Id.*) Finally, it required Lockheed to "provide for the appropriate flowdown of requirements to subcontractors." (*Id.*)

The QA Plans governing the F–22 program also identified industry quality standards as the foundation of Lockheed's contractually required quality program. (CSOF–R Ex. 36.) The initial QA Plan enacted in April 1992, the QA Plan Revision effective in July 1992, and the QA Plan Revision C effective on May 18, 1995, included among their foundational documents the following QA Standards: QA Standards MIL–Q–9858A, MIL–STD–1520–C, and MIL–STD–1535A. (*Id.* at LMC–Howard–1562394, LMC–Howard–1562416, LMC–Howard–1562443.) These QA Plans were signed and approved by representatives of both Lockheed and the Government. (*Id.*) On the other hand, beginning with QA Plan Revision D effective in October 1996, the QA Plans were based

on ISO–9001. (*Id.* at LMC–Howard–1562474.)

QA Standard MIL–Q–9858A applied to F–22 program's quality assurance system, including quality assurance for tooling, at least through October 1996. (CSOF–R 11.) MIL–Q–9858A was cancelled without replacement in October 1996.[7] MIL–Q–9858A did "not list particular specifications or requirements, but rather confer[red] discretion upon a contractor to determine how to implement a system of quality control measures that complies with the poli-

cies embodied in the MIL standard." *U.S. ex rel. Roby v. Boeing Co.*, 189 F.R.D. 512, 512–13 (S.D.Ohio 1999).

MIL–Q–9858A (SOF Ex. 39) was supplemented by MIL–STD–1520C (CSOF–R Ex. 8; SOF Ex. 45) and MIL–STD–1535A (Doc. 313–3). MIL–STD–1520C had provisions regulating the disposition of nonconforming materials including regulations pertaining to repair, rework, and scrapping of materials and the required documentation of nonconformances and corrective actions. (CSOF–R Ex. 8).[8] It was

---

7. A copy of the Notice of Cancellation for MIL–Q–9858A can be found and downloaded at http://www.everyspec.com/MIL-SPECS/MIL-SPECS-MIL-Q/MIL–Q–9858A_NOTICE–2_2886/.

8. Lockheed contends that quality standard MIL–STD–1520C did not apply to tooling because tooling was not a "deliverable" end item under the F–22 Contracts. (CSOF–R 11; CSOF–R Ex. 3, Gallo Dep. 150–51; CSOF–R Ex. 4, Rinney Dep. 97, 99–100; CSOF–R Ex. 5, Carey Dec. ¶ 16; CSOF–R Ex. 6, Beckwith Dec. ¶ 8). MIL–STD–1520C (Tailored) stated the following in relevant part:

> 1.2 *Application.* When referenced in a contract, this standard applies to material and supplies (excluding computer software) *to be delivered* to the Government which fail *to conform to contractual requirements.* Requests for specification changes, engineering changes and major and critical waivers and deviations are not applicable to this standard.

(SOF Ex. 45 at LMC–Howard–2118410 (emphasis added).) Lockheed asserts that because tooling was not delivered pursuant to the DD–250 process, the formal process by which the Government accepted delivery of the aircraft, it did not constitute materials or supplies "to be delivered" for purposes of the application of MIL–STD–1520C.

Lockheed also bases its assertion on the testimony of Phillip Beckwith, the DCMA quality assurance representative for the F–22 program, and Jerry Joyner, a DCMA engineer working at Lockheed's facility in Marietta. They testified that the Government did not accept delivery of the tools using the DD–250 process under the EMD or Production Contracts. (CSOF–R Ex. 6, Beckwith Dec. ¶ 8;

CSOF–R Ex. 7, Joyner Dec. ¶ 11; Doc. 309–2 at 42, Joyner Dep. 163.) Joyner also testified that he did not recall a contractual requirement to track costs associated with scrap, rework, and repair of tooling, a requirement that would have existed if MIL–STD–1520C applied to tooling. (Rel. Supp. Ex. B, Joyner Dep. 163–64.) Lockheed's expert, Colonel Gary Poleskey, USAF (Retired), also opined that tooling was a not a deliverable under the EMD or Production Contracts. (CSOF–R Ex. 29, Polesky Rep. at 20–21.) A second expert testified that the fact the tooling became Government-owned property did not make it a deliverable under the EMD Contract. (LM Reply Ex. TT, Anderson Report at 11–12.)

Relators contend there is at least a question of fact whether tools were delivered to the Government and therefore whether MIL–STD–1520C applied. The language of § 1.2 of MIL–STD–1520C does not limit the quality standard to only materials and supplies delivered to the Government pursuant to the DD–250 process. It applies to any material or supplies delivered to the Government. (SOF Ex. 45 at LMC–Howard–2118410.) Franklin Carey, DCMA's administrative contracting officer for the F–22 program, stated that the Government paid for most of the tooling used to build or maintain the F–22 aircrafts and that the Government had the right of title to tools that it paid for. (Doc. 309–1 at 22, Carey Dep. 83–84.) The Government "had to accept it in order to—to own it." (*Id.*) Carey agreed it was intended that the tools needed to create aircrafts or maintain the fleet were to be delivered to the Government at the end of the program. (*Id.*) Joyner testified that some tools, in fact, were delivered to the

cancelled without replacement in February 1995.[9]

MIL–STD–1535A provided quality requirements for vendors or subcontractors supplying goods or services to prime contractors under government contracts. It was cancelled without replacement in May 1995.[10]

## IV. LOCKHEED'S MOTION FOR SUMMARY JUDGMENT ON RELATORS' FALSE OR FRAUDULENT STATEMENT ALLEGATIONS

Lockheed moves for summary judgment on Relators' claims for false or fraudulent violations of the FCA. Relators respond that summary judgment is inappropriate because questions of material fact exist as to whether Lockheed violated the FCA. Relators assert that there were three categories of violations committed by Lockheed: (1) failure to meet quality assurance standards, (2) purchasing and billing violations, and (3) maintenance of Government property violations.

### A. Failure to Meet Quality Assurance Requirements

#### 1. Claims Based on Failure to Follow Quality Assurance Requirements

Relators allege that Lockheed failed to comply with quality assurance requirements in the contracts. The Court will examine different categories of quality standards which Relators allege were violated in the subsections that follow. However, the Court begins with a quick overview of the elements of an FCA claim as applied to allegations that Lockheed failed to follow quality assurance standards.

■■■ The failure to comply with contractual quality assurance requirements can result in a violation of the FCA. *See Varljen,* 250 F.3d at 430; *Midwest Specialties, Inc.,* 142 F.3d at 302 n. 4. Counsel for Lockheed conceded at the oral argument that violations of contract terms and government regulations which are material to claims for payment can be the foundation for FCA claims. (Doc. 329 at PageID 28510; Doc. 348 at PageID 29566.) The Sixth Circuit stated in relevant part as follows in *Varljen:*

Government at the end of the F–22 program after an inspection process. (Doc. 309–2, Joyner Dep. 98–100.)

Terry Freeman, the Air Force's quality assurance manager for F–22 program from 1989 to 1994 and 2002 to 2007, testified that he believed that MIL–STD–1520C applied to tooling. (Doc. 311 Ex. H, Freeman Dep. 61–62.) Freeman agreed that it was a "basic proposition" that Lockheed "would identify and correct nonconformances related to tooling in compliance with 1520C." (Doc. 311 Ex. H, Freeman Dep. 62.) However, Freeman conceded that he was offering only his opinion. (CSOF Ex. 74, Freeman Dep. 104.) Finally, Kendra Riney, Lockheed's contract director, testified that "[i]f [a] tool was set up as a right to title[,]" then the Government obtained title to that project tool as soon as the tool was completed. (CSOF Ex. 49, Riney

Dep. 100.) Riney further testified that for such right to title tools, the tool "belonged" to the Government even when Lockheed was in possession of the tool and was using it. (*Id.*)

The Court concludes on the basis of this testimony that there is a material dispute of fact whether MIL–STD–1520C applied to tooling. The parties may present evidence on this issue at trial.

9. A copy of the Notice of Cancellation for MIL–STD–1520C can be downloaded at http://www.everyspec.com/MIL–STD/MIL–STD–1500–1599/MIL–STD–1520C_NOTICE–2_23481/.

10. A copy of the Notice of Cancellation for MIL–STD–1535A can be downloaded at http://www.everyspec.com/MIL–STD/MIL–STD–1500–1599/MIL–STD–1535B_NOTICE–1_23513/.

The Relators' complaint alleged that Cleveland Gear did not comply with the "Quality Assurance Requirements," the purpose of which was "to assure the existence of 'critical safety characteristics.'" The contract provision dictated manufacturing processes consistent with the first article products submitted by Cleveland Gear in order to preclude "an unsafe condition including loss or serious damage to the end item or major components, loss of control, or serious injury to personnel." The allegation that Cleveland Gear did not comply with this provision amounts to an allegation that, through fraud, it knowingly produced products that did not meet the contract's quality and corresponding safety requirements. It is undisputed that Cleveland Gear caused to be submitted a "claim" to the government. It is immaterial whether the alleged contractual noncompliance resulted in products with the "same basic performance characteristics" as those that would have been produced in compliance with the terms of the contract.

In light of the fact that it is not essential for an FCA plaintiff to allege damages, and because of the irrelevance of government inspection and the relative quality of conforming and nonconforming products in an FCA case, the Relators' complaint should have survived a motion under Rule 12(b)(6), as it clearly alleges an FCA "injury."

250 F.3d at 431 (citation omitted).

■ As to the materiality requirement, Relators assert that quality assurance was a line item of payment on Lockheed's claims to the Government. (Doc. 267 at 11610). This assertion was not supported by the evidence. (Doc. 345–24; Doc. 346 at PageID 29522.) However, quality assurance was a line item on the monthly cost reports used to track costs. (Doc. 336

at 29121.) Also, the EMD Contract explicitly incorporated quality assurance standards. Finally, Charles Brown, the DCMA quality assurance specialist assigned to the F–22 program, testified that any deviations from contract requirements, including quality provisions, had to be authorized in writing by the Air Force's F–22 system program office. (CSOF–R 67.) A reasonable jury could find that the quality provisions were material based on this evidence.

Regarding scienter and the submission of a false claim, or a false statement material to a claim, the Lockheed director of accounting testified that he certified in each claim for payment submitted to the Government that costs therein were reasonable, allocable, and allowable. (CSOF Ex. 37, Haase Dep. 123–24, 181–87.) Relators can argue to a jury that costs related to tooling were not reasonable or allowable if the contractual quality provisions related to tooling had been violated. See Tetsuwari, 2010 WL 1849324, at *2 (stating that liability can be based on incorrect representations that services conform to contract terms). Also, in each of the subsections below, there is evidence in the form of internal reports or Government communications that suggest that Lockheed knew that it was violating quality provisions or recklessly disregarding a risk that it was violating contract provisions. See Wall, 697 F.3d at 356 (stating that reckless disregard satisfied the scienter requirement).

It also is important to note that Relators allege that Lockheed's quality system was generally deficient from the inception of the program. For example, Relators point out that Al Caudell, the F–22 tooling manager, mistakenly believed that MIL–STD–9858A did not apply to tooling. (CSOF Ex. 17, Caudell Dep. 23, 26.) Caudell testified that Lockheed did not flow the appli-

cable quality standards down to tooling or to tooling vendors for the F–22. (*Id.*)

Relators further allege that the deficiencies in the quality system resulted in Lockheed accepting nonconforming tooling from tooling vendors. For example, Howard Abercrombie was a Lockheed tooling liaison inspector for F–22 tooling. (CSOF Ex. 7, Abercrombie Dec. ¶¶ 5–6.) Abercrombie stated that Lockheed "perform[ed] a 100% inspection of the first five (5) tools delivered by each vendor" at the start of the tooling program. (*Id.*, Abercrombie Dec. ¶ 10.) He stated that these inspections demonstrated that "none of the tooling vendors could produce a conforming product" and that "[s]ome tools were returned to the vendor four (4) or five (5) times before they were finally accepted at LMAS." (*Id.*) Relators also cite a September 1995 memorandum indicating that there were 58 nonconformances on the first floor assembly jig delivered. (CSOF Ex. 117.) Finally, in a March 1996 powerpoint presentation, a Lockheed tool inspection manager stated that that Lockheed had found a 50% rejection rate for tools during an inspection of vendor-made tooling. (CSOF Ex. 263.)

### a. Maintenance of Quality Data

Lockheed was contractually required to maintain certain quality-related documents including information about nonconformances and vendor quality. The 1995 EMD QA Plan ¶ 2.7 required a "proactive system for early detection of nonconformances" and "[d]ocumentation of nonconformances." (CSOF Ex. 266.) The 1996 and 1998 QA Plans also required Lockheed to "provide a system for early detection, control, and proper disposition of nonconforming material" and the "[d]ocumentation of nonconformances ... to drive improvement." (CSOF–R Ex. 36 at LMC–Howard–1562476, LMC–Howard–1562486.) Relatedly, MIL–STD–1535A § 4.3 re-

quired Lockheed to devise a "supplier rating system" to evaluate each supplier's "quality of performance." (Doc. 313–3.) Specifically, § 4.3.1 required that the supplier rating system "yield the necessary basic data to provide visibility of supplier quality performance and trends." (*Id.*)

Also, Lockheed's 1995 QA Plan at § 11.14.2 required "[a] system for collection of costs related to scrap, rework and repair [of non-conforming products] shall be established." (CSOF Ex. 266.) That QA Plan was based on MIL–Q–9858A. MIL–Q–9858A § 3.5 required Lockheed to track data associated with corrective actions taken to tooling such as "products scrapped or reworked to examine extent and causes." (SOF Ex. 39.) Section 3.6 required Lockheed to "maintain and use quality cost data as a management element of the quality program[,]" but gave Lockheed discretion to determine "the specific quality cost data to be maintained." (*Id.*) Finally, FAR 45.505–8 called for Lockheed to keep "records of all scrap or salvage generated."

Lockheed knew by July 1995 that it was not maintaining certain quality-related documents about nonconformances called General Purpose Records ("GPRs"), documents issued against nonconforming tools. (Rel. Supp. Ex. 399, Doc. 336 at PageID 29113–14.) Lockheed determined in the July 1995 Self Governance Program Review that it should include the GPRs results as part of its compliance with the requirement to maintain a supplier rating system.

Relators contend that the failure to track quality data continued after 1995. In January 1998, Lockheed determined in an internal audit referred to as the MR97–28 Audit that the company failed to track information on tool quality. (CSOF Ex. 194.) Specifically, Lockheed found that its management did not receive data

on "the extent, type, and cause of tool nonconformances" nor "on the number of tool nonconformances by supplier." (*Id.*) Lockheed also determined in the MR97–28 Audit that "[c]ontrols have not been provided to ensure that the costs of rework are recorded to that [*sic*], when appropriate, suppliers can be billed for additional costs." (*Id.*)

There was no formal process in place for notifying an at-fault vendor about the existence of a nonconforming tool. (CSOF Ex. 33, Sawyer Dep. 155–56.) Instead, Lockheed made the decision how to proceed on a tool-by-tool basis. (*Id.*) Mel Trott, the tool inspection supervisor, testified that tool inspectors who generated a tool inspection statement of condition report ("TISOC") after determining there was a nonconformance based on vendor error did not provide a copy of the TISOC to the appropriate tool purchasing group. (CSOF Ex. 56, Trott Dep. 198–99.) Finally, Paul Jeffcoat stated in June 2003 that Lockheed was not tracking GPRs in its quality system for supplier performance at the Fort Worth facility. (Rel. Ex. 371, Doc. 335–1 at PageID 28901.)

Additionally, Relators contend that Lockheed destroyed tooling quality documents. Felecia Link, a tool department office employee, testified in her deposition that in or around the late 1990s she was instructed by Mel Trott, the tool inspection supervisor, to destroy hundreds of TISOCs reflecting nonconforming tools produced by vendors. (CSOF Ex. 5, Link Dec. ¶¶ 5–8.) The destruction of the documents was then approved by Eric Sawyer, a tool inspection manager. (CSOF Ex. 3, Cash Dec. ¶¶ 4–10.) The destruction of the TISOCs was witnessed by Coy Cash, a tool inspection employee. (CSOF Ex. 3, Cash Dec. ¶¶ 4–10.)

Lockheed disputes that it was not documenting quality data. As an example of how it documented quality data, Lockheed points to a series of documents from 1995 called "Quality Performance of the F–22 Vendor Tools Received." These documents tracked the number of dimensional and non-dimensional errors for each primary vendor. (Doc. 345–25.) Lockheed further responds that it also tracked quality via a system called the supplier control network and procurement quality network inspections. (Doc. 345–26 to Doc. 345–29.) Additionally, Lockheed contends that it shared the results of the MR97–28 Audit with the Government. (CSOF Ex. 17, Caudell Dep. 258.) Lockheed contends that Relators cannot prove scienter as necessary to establish an FCA claim based on the MR97–28 Audit findings when Lockheed disclosed the known problems to the Government and suggested remedies.

As to the testimony that Mel Trott ordered the destruction of TISOCs, Trott testified that he believed that the documents in the filing cabinets contained documents related to different aircraft programs, not to the F–22 program. (CSOF–R Ex. 9, Trott Dep. 250, 255.) Trott also testified that four copies of each TISOC existed. (CSOF Ex. 56, Trott Dep. 199.) Lockheed argues that because there were multiple copies of each TISOC and because Relators have not identified any missing TISOCs, the Court should not conclude that TISOC information was destroyed.

The Court concludes that genuine issues of material fact preclude summary judgment on this subclaim.

### b. Design Review Processes

Relators also assert that Lockheed failed to implement a contractually required design review process. EMD Contract Attachment 18 at Appendix A–2 § 8.2.2.1 required the use of a three-stage design review process, including a prelimi-

nary design review, a critical design review, and a production readiness design review. (CSOF Ex. 305.) This contractual requirement was consistent with ISO–9001 § 4.4.6 which called for "formal documented reviews of design results" and for "[d]esign validation . . . to ensure that product conforms to defined user needs and/or requirements." (SOF Ex. 40.) Also, FAR 46.105 stated that a contractor's duty to control quality could include controlling quality related to drawings and specifications "to ensure that manufacturing and operations meet the contract's technical requirements." 48 C.F.R. § 46.105(c). Relators cite Lockheed documents from 1995, 1997, and 1998 to support their argument that tool designs were not reviewed as required. (CSOF Exs. 194, 334; Doc. 335–1 at 28880.) For example, the 1998 document stated that "Suppliers are not required by the purchase order to provide their tool designs to [Lockheed] IPT ["integrated product team"] tooling engineers for approval prior to making the tools" and this "could result in an improper tool being made." (CSOF Ex. 194 at LMC–Howard–0000064.)

Lockheed disputes Relators' assertion. Primarily, Lockheed asserts that the provisions of EMD Contract Attachment 18 upon which Relators rely, including § 8.2.2, are not applicable to the tooling contractors. The contract specified that Appendix A–2 of EMD Contract Attachment 18 applies only to "F–22/NATF team major/critical subcontractors" as listed in Attachment A2–1 to Appendix A–2 of the EMD Contract Attachment 18. (Lockheed Reply Ex. U.) The tooling subcontractors were not listed as "major/critical subcontractors" in Attachment A2–1. (*Id.*) However, Lockheed does not refute the applicability of ISO–9001 or FAR 46.105. Relators have identified evidence that cre-

ates at least a genuine dispute of fact regarding whether Lockheed followed adequate design review processes. The Court will not grant summary judgment as to this quality assurance subclaim.

### c. Receiving Inspections, Tool Proofing, and Periodic Inspections

Relators also contend that Lockheed violated mandatory provisions related to tooling inspections, including receiving inspections, tool proofing, and periodic inspections. FAR 52.246–3 required Lockheed to provide "an inspection system acceptable to the Government covering . . . special tooling under this contract." 48 U.S.C. 52.246–3(b). The 1995 QA Plan at § 8.1 stated that "[e]ffective integrated Quality Inspection systems will be provided for the verification of tooling." (CSOF Ex. 266.) However, it also stated that the "ultimate goal is to be able to certify processes and thereby eliminate traditional inspection activities." (*Id.*) The 1995 QA Plan at § 3.4 stated that "production tooling used as a media of inspection" had to be "verified for accuracy at intervals formally established in a manner to cause their timely adjustment or replacement/repair prior to becoming inaccurate." (CSOF Ex. 266.) MIL–Q–9858A at § 5.1 required Lockheed to "assur[e] that all supplies and services procured from his suppliers (subcontractors and vendors) conform to the contract requirements." (SOF Ex. 39 at LMC–HOWARD 1562503.) It further required that "[i]nspection of products upon delivery to the contractor shall be used for assessment and review *to the extent necessary* for adequate assurance of quality." (SOF Ex. 39 at LMC–HOWARD 1562504.) [11]

---

**11.** Relators also cite to § 4.6 of MIL–STD– 1535A to support their assertion that Lock-

MIL–STD–1535A and MIL–Q–9858 were replaced by ISO–9001 as the applicable standards with the adoption of the 1996 QA Plan. ISO–9001 § 4.10.2 required Lockheed as the supplier to "ensure that incoming product is not used or processed ... until it has been inspected or otherwise verified as conforming to specified requirements." (SOF Ex. 40 at 6.) Section 4.12 stated that that "[t]he inspection and test status of product shall be identified by suitable means, which indicate the conformance or nonconformance of product with regard to inspection and tests performed." (SOF Ex. 40 at 7.)

Finally, the EMD Statement of Work at § 3.4.2.6 required Lockheed to "proof production tooling." (SOF Ex. 38; SOF–R 137.) The Statement of Work did not specify the manner by which tool proofing was to be accomplished.

Relators argue that Lockheed violated quality assurance requirements when it discontinued receiving inspections and eliminated the tool try process. On April 8, 1997, Lockheed eliminated the practice of in-house receiving inspection of vendor tools, except "special case by case" situations, in favor of vendor source inspections. (CSOF–R 210; CSOF Ex. 294.) On June 13, 1997, Lockheed eliminated in-house inspection of F–22 Block II tools, except where requested by "tooling engineers or tool inspection supervision or management[,]" in favor of source inspection by the suppliers. (CSOF–R 211; Relators COSF Ex. 123.) Relators assert that Lockheed's vendors did not have sufficiently robust quality systems for Lock-

heed to justify relying on them in place of receiving inspections. Relators also contend that Lockheed should have determined on a vendor-by-vendor basis whether each vendor had sufficient objective evidence of quality that receiving inspections could be eliminated. (CSOF Ex. 79, Shermon Roberts's Report at 4.1.1.) [12]

The evidence regarding the efficacy of Lockheed's inspection programs is mixed. Lockheed determined that there was a 50% rejection rate for tooling in a power-point presentation from March 1996 called "Inspection of Vendor Supplied Tools." (CSOF Ex. 263.) Lockheed found both dimensional and non-dimensional problems with the tooling. Eric Sawyer, a Lockheed tool inspection manager, stated in the presentation that the original Lockheed plan called for no source inspections, only sample receiving inspections, and audit visits to vendors. However, Lockheed then implemented a corrective plan of source inspections (*i.e.*, inspections at the vendors) and Sawyer concluded that the source inspections led to both an increased acceptance rate and a reduced inspection time. (*Id.*) Lockheed asserts that this is an example which demonstrates that its quality assurance program identified and remedied a problem.

Lockheed also states that the elimination of in-house inspections cannot be the basis of an FCA claim because the Government encouraged and consented to the elimination. "If both the contractor and the government interpret the contract one way throughout the contract's history, it is

heed was required to conduct receiving inspections of vendor tools. Section 4.6 required that supplies and services procured from outside vendors "for incorporation into the contract end item shall be subject to inspection at the time of receipt." (Doc. 335–2 at 72.) However, tooling by its nature is not a good or service that is incorporated into the

contract end item. It is used to make parts which are incorporated into the contract end items, the F–22 aircraft. Section 4.6 is not applicable.

12. Lockheed has moved in limine to strike Shermon Roberts's expert report. (Doc. 253.)

unthinkable that the contractor's billings which follow this common interpretation could constitute a false claim." *U.S. ex rel. McCoy v. Seaward Marine Servs., Inc.*, No. 91–1642, 1992 WL 182816, at *3 (4th Cir. Aug. 3, 1992). The elimination of receiving inspections was a goal as early as in the 1995 QA Plan. Terry Freeman, the Air Force's QA Manager for the F–22 Program, testified that receiving inspections were "the least efficient way to determine product quality" and he agreed that reduction of inspections is the "objective of any good quality program." (CSOF Ex. 74, Freeman Dep. 92.) Freeman testified further that "hands-on inspection" was disfavored and that the Air Force expected that during the EMD process Lockheed would develop an automated manufacturing program which would identify problems. (*Id.*, Freeman Dep. 93.) Freeman

concluded his remarks by noting that receiving inspections were an indication that a contractor did not trust the quality systems of its subcontractors. (*Id.*, Freeman Dep. 94.)

However, Relators point to the deposition testimony of Hal Sanders, a Lockheed internal audit supervisor. He conducted an audit in 1997 in which he examined the processes of source inspections at vendors and receiving inspections at Lockheed. (CSOF Ex. 77, Sanders Dep. 155–57.) He determined that receiving inspections were needed still. (*Id.*) Lockheed nonetheless eliminated inspections in 1997.

Turning to tool proofing, Relators contend that Lockheed used a process called tool try to satisfy the tool proofing contractual requirement.[13] Eric Ouellette, an

---

**13.** There is a genuine dispute of material fact whether tool try was the process by which Lockheed accomplished the mandatory process of tool proofing. Relators' witnesses equate tool proofing with tool try. Lockheed, however, distinguishes between tool proofing and tool try. Lockheed's witnesses equate tool proofing to first article inspection and contend that tool try is a process which tests the usability of a tool.

The Air Force's Terry Freeman testified that tool proofing was "that part of the process that shows you whether the tool works or not." (LM Reply Ex. N, Freeman Dep. 67–68.) He further testified that he understood "tool try" and "tool proofing" to mean the same thing. (*Id.*) Freeman admitted, however, that that he did not have familiarity with the tool try program at Lockheed. (SOF Ex. 13, Freeman Dep. 106.)

Gerald Rempfer, a senior tool engineer for Lockheed, testified that tool proofing and tool try essentially "merged into one" in Marietta. (CSOF Ex. 36, Rempfer Dep. 102.) Al Caudell, the F–22 tooling manager for Lockheed, also testified that the terms tool try and tool proof were used interchangeably in Marietta. (CSOF Ex. 17, Caudell Dep. 377.)

In November 1995, J.E. Phillips, the Lockheed vice-president of operations, wrote in a response to a Government issued corrective

action request that "tool try validates all the processes from the time the shop order was released ... [and] [u]ntil the tool inspection function is complete, no one has formally validated part features." (CSOF Ex. 187.)

Anthony Gallo, the Lockheed director of quality for the F–22, gave conflicting testimony regarding tool try and tool proofing. First, he suggested that he was "not sure of the difference between" tool try and tool proofing and not "infinitely familiar" with tool try. (Lockheed Reply Ex. H, Gallo Dep. 127–29.) He then stated that he equated tool proofing with "first article inspection." (*Id.*) He also stated that he thought a tool try was a different process designed to "us[e] the tool to see if it makes a proper part" and to "check[ ] its usability by the person who had to use it." (*Id.*)

Likewise, Jerry Joyner, the DCMA engineer assigned to the F–22 project, equated tool proofing to first article inspection. (Doc. 309–2, Joyner Dep. 53–54.) He stated that tool proofing was the process by which the Government ensured that the tool made an acceptable part. (*Id.*, Joyner Dep. 53–54, 59.) He differentiated tool try as an internal process, not required by contact, by which Lockheed verified for their purposes that the tool worked. (*Id.*, Joyner Dep. 59, 107, 165.)

F–22 quality manager, issued a quality alert on May 5, 1998 documenting a concern that tools being used in the assembly area had stickers indicating that a tool try had not been completed. (*Id.*) In some cases, tools were used with only verbal okays or with undocumented fixes. "Nonconformances have been noted as a direct result of use of tools that are on tool try or as result of a work around that was not provided by tool inspection." (*Id.*) Further, Ouellette stated that "[a]s a direct result of these actions, tools have not been corrected and are directly responsible for nonconformances that are being noted during the assembly build process." (*Id.*) Ouellette did not provide a copy of the quality alert to the Government. (CSOF–R Ex. 2, Ouellette Dep. 188–95.) However, he said discrepancies and nonconformances would have been reported on nonconforming material document reports which were available to the Government. (*Id.*)

Lockheed eliminated the tool try process in Marietta in March 1999 following a tool try review by an internal "Six Sigma" team. (CSOF Ex. 59, Mason Dep. 117; CSOF Ex. 192.) The Six Sigma team recommended eliminating tool try because

tools were staying at the tool try stage for "inordinate amount of time." (CSOF Ex. 59, Mason Dep. 117–18.) The Six Sigma team assumed "that outside F–22 suppliers were performing proper inspections on those tools." (*Id.* at 131.) The Air Force knew by 2001 that tool try had been eliminated. (SOF–R 142.) Tool try was reinstated at Marietta in November 2005. (CSOF Ex. 168.) Relators contend that Lockheed breached the contractual requirement and violated the FCA during the period in which the tool process was eliminated.

Relators also point to evidence that Lockheed did not meet its periodic inspection requirements. On April 2, 2002, DCMA issued a Level I Corrective Action Request ("CAR") regarding production tooling in LM–Aero Fort Worth. (CSOF Ex. 254.) DCMA alleged that Lockheed had not met contractually required quality provisions contained in Aerospace Standard AS9000. (*Id.*) Specifically, the CAR alleged that Lockheed had inadequate control of production tooling, the periodic inspection system, and the tool maintenance system. (*Id.*) One problem involved interchangeable and replaceable tools which had been omitted from the periodic inspec-

---

Eric Ouellette, the F–22 quality manager for Lockheed, also testified as to the differences between tool proofing/first article inspection and tool try. He testified that first article inspection was "specific to the part" and was used to prove "whether a production process can consistently produce the same part, assembly, that type of thing." (Lockheed Reply Ex. AA, Ouelette Dep. 72–73.) He stated that tool try was "specific to the tool" and examined the tool components, part details, and instructions to determine whether the tool would work for the production team. (*Id.*, Ouellette Dep. 72–74.)

Lockheed also points to a written operations procedures memorandum to support its position that tool try was not the equivalent of tool proofing. The memorandum, dated August 31, 1992, states that "[t]ool try may be

waived by Tool Inspection if assured that the tool is acceptable." (CSOF–R Ex. 20.) Lockheed contends that its written procedures would not authorize the waiver of tool try if tool try had been contractually mandated. However, the same memorandum describes tool try as a procedure which "determines that the tool will, within practical limits, consistently produce acceptable parts or assemblies, using the manufacturing plan, the production machines, and the operations for which it was made." (*Id.*) This description makes tool try sound more like the tool-proofing process than a process to determine the "usability" of a tool.

The Court finds that reasonable factfinders could disagree whether Lockheed's tool try process was a means by which Lockheed met its obligation to proof production tooling.

tion schedule or annotated incorrectly on the schedule.[14] (*Id.*) DCMA referred to the problems as systemic. (*Id.*)

Lockheed concluded in a 2004 Project Tooling Sweep that "[p]rocedures defining periodic inspection requirements specific to project tools are lacking or non-existent" and that more than 200 tools were overdue for inspection. (CSOF Ex. 120.) Also in 2004, DCMA issued a Level III CAR stating "grave concerns about your failure to maintain an acceptable inspection system." (CSOF Ex. 209.) Colonel Lopez concluded that periodic inspection requirements had not been implemented as of May 25, 2005. (CSOF Ex. 298.) Lopez stated as follows in an email:

> As of today, Special Tooling Periodic Inspection requirements have not been completely implemented. All Special Tooling, regardless of program, that is utilized as a media of product acceptance must be subjected to Periodic Inspection (PI) to establish and ensure continuing accuracy. This is a requirement of the LM Aero Quality Management System which is designed to comply with the overarching contractual quality requirement for compliance to AS 9100 Aerospace Standard, rev b, dated 2004–01.

(CSOF Ex. 298.)

In 2006, Harry Gardner, the DCMA Industrial Specialist, stated that a 2006 audit revealed that "Special Tooling used as a media of acceptance continued to have numerous deficiencies associated with Special Tooling management." (CSOF Ex. 279.) Gardner stated that "[t]he PARS2 PER property record reflected Periodic Inspection requirements that were incorrect, numerous data entry errors and fifty one tools were found delinquent for Periodic Inspection as much as three years (LM–Aero Marietta)." (*Id.*)

In the next subsection, the Court discusses evidence suggesting that Lockheed had concerns about quality performance of some of its tooling vendors when it selected those vendors. In later sections, the Court discusses multiple exhibits identified by Relators which create questions of fact regarding the existence of nonconforming tools caused by vendor error and nonconforming parts made by nonconforming tools. This evidence, along with the internal reviews and reports discussed above in this subsection, are additional circumstantial evidence that the inspection processes implemented by Lockheed to fulfill its quality assurance obligations were deficient. Relators have established a material factual dispute whether Lockheed met its quality assurance inspection requirements. The Court will deny summary judgment to Lockheed on this quality assurance subclaim.

### d. Selection of Vendors

Relators assert that Lockheed awarded tooling work to unqualified vendors. Quality standard MIL–STD–1535A at § 4.2.1 required Lockheed to rate subcontractors by quality, including by evaluating prospective vendors' quality systems with pre-awards surveys. (Doc. 313–3 at PageID 27797.) It further required Lockheed to have "procedures for the determination, prior to issuance of the purchase document, of the capability of the prospective suppliers, whether existing or new, to produce the components, equipment or systems, or to supply the service in accordance with contractual requirements." (*Id.*) Section 4.3.1 required Lockheed to have a "supplier rating system" which measured each supplier's "quality of performance." (Doc. 313–3 at PageID 27798.) Section 4.3.2 required Lockheed to give

---

14. I/R tools were contractually required to be interchangeable and replaceable. The I/R re-quirements issue is discussed in a subsequent section.

each vendor's quality rating "consideration comparable to other performance indicators when selecting suppliers." (*Id.*)

Relatedly, FAR 52.244–5 required a contractor to select subcontractors "on a competitive basis to the maximum practical extent consistent with the objectives and requirements of the contract." 48 C.F.R. § 52.244–5. Lockheed admitted that it was "responsible for assuring the quality of its tooling vendors." (CSOF–R 558.)

Lockheed purported to use a competitive bidding process for tooling work outsourced to vendors. Vendors were scored on a rating system using a scale that was 40% competitive, 40% technical, and 20% quality. (CSOF–R Ex. 51, Lewis Dep. 26.) Relators suggest that this alone is evidence that Lockheed did not rate quality comparable to other performance indicators as required by MIL–STD–1535A. Work that was awarded to the vendor who was not the lowest bidder had to be justified with documentation. (*Id.*)

Relators argue that bids were regularly awarded without concern for vendor quality. As one example, Lockheed awarded Tucker Tools the bid for "tooling package # 7" in or around July 1994 despite having the lowest quality score among its group of competitors. (CSOF–R Ex. 197.) The Lockheed employees who reviewed the quality results of the bidding vendors had recommended the selection of VT or Votaw Precision to be the vendor for tooling package # 7. (CSOF–R Ex. 208.) In response, Lockheed explained that Tucker had the highest technical score and that the quality score was not ignored. (CSOF–R Ex. 197 at LMC–HOWARD– 0340906.) Mel Trott testified that Tucker had received a low quality score because they failed to submit their quality plan for review. (CSOF–R Ex. 9, Trott Dep. 165.) Dan Lewis, a senior material representative, recommended that Tucker be award-ed the bid, but only after Lockheed reviewed Tucker's quality systems. (CSOF– R Ex. 197 at LMC–Howard–0340882.) Lockheed later determined that Tucker met all quality assurance specifications. (Doc. 345, LM SJ Arg. Ex. 08.)

Relators also point to other items of anecdotal evidence to support their allegation that Lockheed used unqualified vendors. For one example, a 1995 memorandum authored by Bryan Ferris states Ferris's "concern with respect to [vendor] Aerobotics capability to machine F–22 tools within the required tolerances" and states that "very few tools form Aerobotics have passed through inspection without being rejected." (CSOF Ex. 219.) In a second example, the vendor Hyde was criticized in an IPT team memorandum in 1996 based on the "assessment [ ] that the majority of their designs are late to our need and their tool design quality is substandard." (CSOF Ex. 118.) Lockheed responds that Relators over-generalize based on criticisms and that the memos did not establish that the vendors were unqualified. For example, Lockheed contends that Hyde was understaffed, not unqualified, and that Hyde brought in additional workers in response to Lockheed's concerns. (CSOF–R Ex. 66, Martineau Dep. 124.)

A Lockheed memo dated November 14, 2002 set forth new controls for procurement addressing the problem of solesourcing and the need to have competitive bidding:

-FAR states that we must compete as much as possible. This means that single source procurements will be held to a rare exception basis only. I will need to approve all single source procurements. Competition will be the normal course of business. If the IPT flags a package as hot, procurement will shor-

ten the bid time as much as possible in order to support.

-**All bids will go through the bid room.** Pricing data is proprietary and will be protected within procurement.

(CSOF Ex. 240 (emphasis in the original).) However, by January 2003, Pam Campbell, a procurement manager, stated in an email that she believed that the new procedures were "being thrown out" in a return to "business as usual." (CSOF Ex. 309.)

Relators also cite concerns raised in a document dated July 21, 2003 entitled Process Integrity Special Review of Marietta Tooling Procurement. (CSOF Ex. 258.) The Special Review identified "concerns regarding procurement" that had been raised in emails from October 2002 through January 2003. Those concerns included "[l]arge amounts of single source work awarded based on tight schedule/urgent requirement without competition[,]" and "[c]ertain vendors receive a major portion of awards[.]" (CSOF Ex. 258.) Specific vendors identified were Tucker Technology, West Cobb Engineering & Tool Co., Inc., and Summit Design and Manufacturing. (*Id.*)

The Court concludes that Relators have submitted sufficient evidence to go forward to a jury on the issue of whether Lockheed violated quality assurance provisions related to the selection of vendors.[15]

#### e. Problems with Shop Aids

Relators assert that "shop aids" improperly were used in place of tools at Lockheed. A Lockheed written operations procedure statement dated June 30, 1995 described a shop aid as follows:

A shop aid is neither a special tool nor a standard tool. A shop aid is a simple device or fixture used exclusively within one department, and usually made by that department, to facilitate a manufacturing operation. Shop aids are not to be used as inspection media or to control configuration.

(CSOF–R Ex. 185.) In defining the requirements for use of a shop aid, the written operations procedure statement indicated that a "shop aid is for limited short-time use." Timothy Benjamin, a tool and plastics builder, testified that shop aids were only to be used as temporary repair tools. (CSOF Ex. 75, Benjamin Dep. 33.) Steven Lacefield also testified that shop

**15.** To the extent that Relators attempt to argue a separate claim based on the allegation that Lockheed improperly awarded tooling subcontracts to vendors who had relationships with Lockheed, instead of basing the vendor awards on quality, the separate claim fails. Relators argue, based on *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.,* 352 F.3d 908 (4th Cir.2003), that a contractor's failure to disclose a conflict of interest between the contractor and its subcontractor to the Government can form the basis of an FCA claim. However, in *Harrison,* the master contract between the defendant contractor and the Government required the contractor to submit a no-conflict-of-interest certification to the Government in order to have the subcontract approved. *Id.* at 916. Relators have not identified a similar contractual provision in the contracts between Lockheed and the Government.

FAR 44.202–2 states that "careful and thorough consideration" must be given when "[c]lose working relationships or ownership affiliations between the prime contractor and subcontractor may preclude free competition," but it does not bar such conduct. 48 C.F.R. § 44.202–2(b). A Lockheed internal policy prohibited it from "retain[ing] the services of a retiree through a third party vendor within six months of the individual's retirement" from Lockheed, (CSOF Ex. 258 at LMC–Howard–1354864), but Relators have not established that this internal policy was material to the Government's decision to make payments under the F–22 contracts. Finally, much of the evidence Relators cite in support of this argument is inadmissible because it constitutes hearsay or was not based on personal knowledge. (*See* CSOF 563, 565, 573.)

aids generally were intended to be temporary-use products. (CSOF Ex. 71, Lacefield Dep. 266–67.) Despite this evidence, Lockheed points to policies dated 2002, but effective beginning in 1999 and 2000, which contemplated the use of shop aids on a repetitive basis and for their reclassification to project tools. (CSOF–R Ex. 186, 187.)

Relators contend that the use of shop aids caused problems. At an unspecified date in or after August 2004, the Marietta F/A–22 Project tooling team issued a tool sweep report on all tools in the assembly and flight line area. (CSOF Exs. 120, 246.) It noted a discrepancy between two written policies about whether a shop aid that is used repeatedly must be turned into a tool. (CSOF Ex. 246 at LMC–Howard 1305903.) The tooling team also stated that 172 shop aids were being used as tools in the assembly and flight line areas. (*Id.* at LMC–Howard 1305895.) The tooling team noted two specific "problematic" issues with the project tools in the canopy build-up area. (CSOF Ex. 120 at HM002599.) First, "one major fixture [was] designated as a Shop Aid while awaiting closure of the rejection status." (*Id.*) Second, a "shop aid [was] in use that affect[ed] configuration of the aircraft." (*Id.*)

In one incident, a 30,000–pound aircraft fell to the ground when the shop aid used to support it failed. (CSOF Ex. 211.) Lockheed does not refute that this occurred, but it states that the incident is not

evidence that the use of shops aids is improper. Lockheed states that the shop aid in question supported only 18,000 pounds so it should not have been used to support the 30,000 pound aircraft. (CSOF Ex. 211; CSOF–R Ex. 93, Nolet Dep. 177.)

 This quality assurance subclaim fails. Relators have identified only an internal operations procedure alleged to have been violated. They have not established that the Government contractually required the operations procedure to be used nor that it was material to the payment of claims. The Court will grant summary judgment to Lockheed on this subclaim.

### f. Conclusions on Claims Based on Failure to Follow Quality Assurance Requirements

The Court will deny summary judgment to Lockheed on the claims based on failure to follow quality assurance requirements for the reasons stated above, except that the Court will grant summary judgment to Lockheed on the subclaim based on the use of shop aids.

### 2. Claims Based on Nonconforming Tools and Nonconforming Parts

 Along with claims based on violations of quality-related contractual provisions, Relators assert Lockheed separately violated the FCA to the extent that the Government paid for nonconforming tools and nonconforming parts made by the nonconforming tools.[16]

---

**16.** Relators' attorney argued that claims based on the failure to follow contractual quality assurance provisions are separate and distinct from claims based on nonconforming tools and parts.

> [T]he first claim is that very thing: Lockheed failed to maintain or implement an adequate *Tooling Quality System.*
> * * *

> I've gone over the overall Quality claim that we have under the False Claims Act, which is kind of the *Midwest Specialties* claim. It's *Varljen* in the Sixth Circuit where you have to have quality. It's not good enough to produce planes. It's not good enough to produce parts. It's not good enough to produce tools. They actually have to have a Quality System.
> * * *

### a. Nonconforming Tools Caused by Vendor Error

Relators assert that the evidence is sufficient to establish at least a material dispute of fact concerning whether vendors provided nonconforming tools to Lockheed. Relators identify hundreds of tools as being nonconforming due to vendor error. (CSOF–R 179, 181; CSOF Exs. 100, 105, 270, 282, 351A, 351B, 351C, 351D; CSOF Ex. 2, Harrison Dec.; CSOF Ex. 48, Mize Dep. 202–03; CSOF Ex. 56, Trott Dep. 140.) Lockheed documented tooling nonconformances on TISOCs, "tool inspection statement of condition" reports. Relators contend that the nonconformances on the TISOCs identified by Relators were caused by vendor errors. Lockheed, on the other hand, argues that the TISOC reports did not establish that vendor errors caused the nonconformance. Al Caudell, the F–22 tooling manager for Lockheed, identified ten potential causes for tooling nonconformances, including damage during shipping, design changes, and issues with tool assembly and installation. (SOF Ex. 35, Caudell Dec. ¶ 6.) [17]

Relators point out that Lockheed could have notated on the face of a TISOC if an intervening design change or shipping damage was the cause of the particular tooling conformance. Such notations were not present on the TISOCs at issue.

(CSOF Ex. 2, Harrison Dec. ¶¶ 31–41; CSOF Ex. 13, Moss Dec. ¶ 35, 41–42.) Lockheed tool inspectors, including Relator Moss, Relator Harrison, and William Howard Abercrombie, testified that the tools at issue were nonconforming based on vendor error. (CSOF Ex. 2, Harrison Dec. ¶¶ 38–41; CSOF Ex. 13, Moss Dec. ¶¶ 39–43; CSOF Ex. 7, Abercrombie Dec. ¶¶ 24–28, 31, 33–36, 40–47.) Relators argue that the tooling inspectors' testimony is sufficient to establish at least a jury question on the issue of whether the nonconformances were caused by vendor error. Relators point out that Harrison was a liaison tooling inspector "responsible for interacting with other departments within Lockheed to determine the causes of tooling nonconformances." (SOF Ex. 30, Harrison Dep. 18; CSOF Ex. 2, Harrison Dec. ¶ 3; CSOF Ex. 13, Moss Dec. ¶ 4.) Harrison and Moss had years of training and experience in both generating TISOCs and reviewing TISOCs generated by others. (CSOF Ex. 2, Harrison Dec. ¶¶ 2, 26–30; CSOF Ex. 13, Moss Dec. ¶ 2, 28–30.)

Lockheed responds that the TISOCs were not conclusive evidence that nonconforming tools were caused by vendor error. At his deposition, Relator Harrison testified that he had assumed the nonconformances were based on vendor error. (Lockheed Reply Ex. X, Harrison Dep. 244; CSOF Ex. 25 Harrison Dep. 277.)

---

But beyond that, [the second claim is that] each nonconforming tool is a separate False Claims Act action.
(Tr., Doc. 333 at 28673–75.)

**17.** Caudell identified the following items as reasons he identified as being the cause for nonconformances:
 a. Engineering changes to a tool or part;
 b. Design changes to a tool;
 c. Incomplete or inaccurate engineering information provided to the tool manufacturer;
 d. Issues related to interpretation of tooling concepts;

 e. Incorrect or inaccurate inspection by Lockheed Martin;
 f. Damage or jostling in shipping;
 g. Issues related to environmental differences when a tool is inspected (humidity and temperature);
 h. Tolerances called out in tool design that exceeded the capabilities of the N/C machines and in some cases measuring instruments;
 i. Issues with tool set up and assembly at Lockheed Martin; and,
 j. Tool manufacturer's error.
(SOF Ex. 35, Caudell Dec. ¶ 6.)

Tooling inspector Abercrombie testified that he made his conclusion after determining that the dimensions on the tool were not the same as on the tool drawing provided to him. He did no further investigation. (CSOF–R Ex. 50, Abercrombie Dep. 116–17.) Another Lockheed tool inspector, Tommy Free, testified that he could not know whether a nonconformance on a tool had been caused by shipping, vendor error, or something else. He stated that it was not his job as a tool inspector to determine the cause of a nonconformance. His only task was to document the condition of the tool at that point in time. (CSOF–R Ex. 70, Free Dep. 51–52, 79–80, 132.) The Court finds that a material dispute of fact exists as to whether Relators have established that the tooling nonconformances listed on the TISOCs were caused by vendor error.

Nonetheless, the existence of nonconforming tools caused by vendor error is not sufficient to establish that Lockheed submitted false claims to the Government in violation of the FCA. Lockheed argues that the existence of a nonconforming tool did not constitute a breach of contract nor an FCA fraud claim because the EMD Contract contained no specifications for the aircraft design or for tooling. The EMD Contract was a performance contract, not a design contract. As a performance contract, the EMD Contract only had performance specifications which "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, *selecting the means and assuming a corresponding responsibility* for that selection." *P.R. Burke Corp. v. U.S.*, 277 F.3d 1346, 1357 (2002) (emphasis in the original) (internal citation and quotation omitted).

Franklin Carey, DCMA's contracting officer, testified that there were no requirements for tooling design under the EMD Contract. (Doc. 309–1, Carey Dep. 41, 44.) He testified that development and design of the tools were left to Lockheed's discretion. (Doc. 309–1, Carey Dep. 30.) Jerry Joyner, a DCMA engineer, concurred that Lockheed "had design authority on tool development." (Doc. 309–2 at 13, Joyner Dep. 46.) Lockheed argues that any examples of tooling nonconformances during the EMD Contract is merely a nonconformance with Lockheed's own design and not a nonconformance with an obligation to the Air Force.

Additionally, Lockheed argues that Relators have not identified evidence sufficient to prove that Lockheed acted unreasonably when it found tooling nonconformances. FAR 31.201–2(a) stated that costs were allowable if reasonable. 48 C.F.R. § 31.201–2(a). FAR 31.205–26 specifically allowed a contractor to include as material costs reasonable overruns, spoilage, or defective work. 48 C.F.R. § 31.205–26(a). Accordingly, Lockheed was permitted to bill the Government for nonconforming tools as long as the costs incurred were reasonable. "Allowable costs include those costs incurred in producing defective material ... as long as the amount of defective material is not unreasonable." *Ind. Tectonics Bearings Corp. v. U.S.*, 44 Fed. Cl. 115, 120 (F.Cl.1999) (quoting *John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts* 1118 (3d ed.1995)).

Lockheed's Operations Procedure 91–030 § (V)(C)(2) required a tooling engineer to estimate the labor, material, and schedule for remedying a nonconforming tool. (CSOF–R Ex. 63.) Lockheed then had to document the costs on a vendor data request. (*Id.*) The IPT tooling engi-

neer determined whether to return the tool to a vendor or retain the tool. Brian Drummond, a tool engineer, testified that Lockheed's default response was to return a nonconforming tool to the vendor to be fixed, but that Lockheed would fix the tool in-house if it was more efficient or cost-saving. (SOF Ex. 26, Drummond Dep. 213–14.) Franklin Carey, DCMA's contracting officer, agreed that Lockheed could exercise its business judgment in this manner to determine the best way to remedy the nonconformance. (Doc. 309–1, Carey Dep. 49–51.) Non-fraudulent business decisions cannot form the basis of an FCA claim. *See Mann v. Heckler & Koch Defense, Inc.*, 630 F.3d 338, 346 (4th Cir. 2010).

Relators have not offered evidence regarding how Lockheed remedied particular tooling nonconformances. As such, Relators have not established Lockheed's conduct, or its billing of the Government therefore, was unreasonable. Absent a finding of unreasonableness, Relators cannot prove that Lockheed submitted a false or fraudulent claim. *See* 48 C.F.R. § 31.201–2(a); 48 C.F.R. 31.205–26(a). Relators have failed to establish an FCA claim in respect to the billing related to specific tooling nonconformances. For that reason, the Court grants summary judgment to Lockheed to the extent that Relators have sought to establish that each and every nonconforming tool led to the submission of a false claim to the Government for payment. However, Relators will be permitted at trial to introduce evidence regarding the existence of alleged tooling nonconformances caused by vendor error as circumstantial evidence that Lockheed maintained an inadequate quality assurance program.

### b. Nonconforming Parts Caused by Nonconforming Tools

Relatedly, Relators assert that they have sufficient evidence that nonconforming tools caused nonconforming parts to submit the issue to a jury for consideration. The Air Force's Terry Freeman, for example, testified in the abstract that "you don't get good parts off bad tooling." (CSOF Ex. 74, Freeman Dep. 33.) Relators' purported expert, Shermon Roberts, opined that "when defective tools are used in production, there is a strong likelihood that those tools will produce parts that fail to conform to design specifications." (CSOF Ex. 79, Roberts Rep. § 4.2.) In a different case in which Roberts testified that an inadequate quality assurance system could result in the delivery of bad parts, the district court allowed an FCA case to withstand a motion for summary judgment based on evidence showing a "widespread knowledge" about defective parts. *Jordan v. Northrop Grumman,* No. CV 95–2985 ABC, 2002 WL 34251040, at *16–17 (C.D.Cal. Aug. 5, 2002).

Relators point to more than opinion testimony that nonconforming tools produce nonconforming parts. Relators point to a quality assurance document system report, apparently generated for this litigation, which contained 568 quality assurance reports with a code indicating "a tooling cause code." (CSOF Ex. 340.) However, Bob Nethery, testified that a tooling code on a quality assurance reports indicates that tooling was relevant to the corrective action taken, but does not indicate whether the error was caused in-house or by the outside vendor. (CSOF–R Ex. 95, Nethery Dep. 104.)

Relators also point to the testimony of Otis Bryson who testified that a nonconforming tool used in production created 40 or 50 bad parts before they realized that the tool was bad. (CSOF Ex. 63, Bryson Dep. 236–37.) However, on cross-examination he admitted that he had no personal knowledge about the bad tool creating bad

parts; rather, he had heard about it from other workers. (CSOF–R Ex. 150, Bryson Dep. 254–55.) He also admitted that he did not know if vendor error had caused the bad tool or whether the tool might have been bad because of a design change. (*Id.*)

Even if the evidence creates a material dispute of fact regarding whether bad tools created bad parts, Relators must prove that the bad tools led to false claims for payment. FAR 31.205–26 allowed Lockheed to include as material costs reasonable overruns, spoilage, or defective work. 48 C.F.R. § 31.205–26. Lockheed was permitted to bill the Government for nonconforming parts so long as the costs incurred were reasonable. *See Ind. Tectonics Bearings Corp.*, 44 Fed.Cl. at 120. Relators have the burden to prove that the costs submitted for nonconforming parts were unreasonable. They have not identified evidence regarding the reasonableness of the billing for the allegedly nonconforming parts. For that reason, the Court will grant summary judgment to Lockheed to the extent that Relators have sought to establish that each and every nonconforming part created by a nonconforming tool (which was caused by vendor error) led to the submission of a false claim to the Government for payment. However, Relators will be permitted at trial to introduce evidence regarding the existence of alleged nonconforming parts as circumstantial evidence that Lockheed maintained an inadequate quality assurance program.

### c. Nonconformances Related to I/R Requirements

Next, and related to the previous claims for relief, Relators assert that Lockheed submitted false claims for payment to the extent that certain aircraft had parts that did not meet contractual interchangeability and replaceability ("I/R") requirements. Lockheed was contractually obligated to ensure that certain aspects of the F–22 aircraft were interchangeable or replaceable. (CSOF Ex. 321 at 3; CSOF Exs. 217, 218.) Lockheed admitted that it entered into a Bilateral Agreement for a single process initiative ("SPI") with the Government dated April 2, 2001 that addressed the I/R requirements and contemplated completion of the SPI process three months after the effective date of the agreement. (CSOF Ex. 321 at 3.) The SPI process covered all three Lockheed facilities (Marietta, Ft. Worth, and Palmdale). (CSOF–R Ex. 95, Nethery Dep. 154–56, 179.)

In 2002, DCMA issued a CAR 02–E–058 asserting that Lockheed had not complied with the SPI Bilateral Agreement. (CSOF–R 347.) CAR 02–E–058 was elevated to a Level II CAR in 2003. (*Id.*) DCMA explained problems that were caused by the failure to implement SPI as follows:

> The lack of an adequate (I/R) system resulted in operational F/A–22 aircraft being delivered to the Government without configuration of flight opening doors and major aircraft structures being verified. Aircraft receiving inspections revealed aircraft 4012 and 4013 had a severe fouling condition between the Main Weapons Bay (MWB) door and the Airframe Mounted Accessory Drive (AMAD) panel resulting in damage to the MWB doors on both aircraft. These deliveries of defective products to the Government by Lockheed Martin Aeronautics Company are a clear violation of contractual requirements.

(CSOF Ex. 208.) In response to the CAR, Lockheed implemented a corrective action plan. (CSOF–R Exs. 138–40.) The CAR was closed by DCMA on May 10, 2007 after it had validated the milestones created by the corrective action plan. (CSOF–R Ex. 140.)

Col. Kevin W. Lopez wrote in an email to Nicholas P. Cessario on May 25, 2005 as follows:

F/A–22 Interchangeability/Replaceability (I/R) is a contractual requirement contained in the EMD contract . . . The contractor has been paid during EMD contract to develop an I/R system that will support production aircraft and the contractor has been paid to implement SPI 2000–21 requirements. In both cases, it appears LMA has fallen short of the contractual requirements. . . . Today, the F/A22 aircraft are being delivered to the war fighter with 24 I/R structures that do not meet the engineering requirements for I/R.

(CSOF–R ¶ 410.) Lockheed reached a similar conclusion in a January 9, 2008 internal Management Summary after the corrective action plan was implemented. (CSOF Ex. 261.) Lockheed found "significant deficiencies for the implementation and execution of I/R requirements" and an "[i]nability to implement and sustain corrective actions to the F–22 Level 2 CAR." (Id.)

Relators assert that the systematic problems with periodic inspections detailed above in an earlier section and with SPI led to nonconforming I/R parts. As a specific example, the first 117 aircraft delivered to the Government had non-I/R-compliant canopies. (CSOF–R ¶ 418.) Additionally, a Level III CAR dated November 5, 2004 pertaining to Fort Worth found that Gun Port Door hinges did not meet their I/R requirements because they were individually custom fitted to the mid-fuselage, despite the misleading use of a "stamp" signifying that a required special tool was used. (CSOF Ex. 209.) The Gun Port Door nonconformance was given as an example to support the general "grave concern" raised that Lockheed failed to "maintain an acceptable inspection system." (Id.)

However, Lockheed disputes an FCA violation resulted from claims submitted for any particular non-I/R compliant aircraft. As to the Level III CAR, Lockheed points out that its management personnel discovered the problem and disclosed it to the Government. (Doc. 345 Ex. 46, Nolet Dep. 296.) Second, Lockheed contends that the fact that the Government was aware of these nonconformances, as evidenced by the Government's communications to Lockheed about these issues, negates the possibility of fraud by Lockheed against the Government. Phillip Beckwith, the DCMA quality assurance representative, testified that an I/R Board, composed of representatives from DCMA, the Air Force, and Lockheed, handled issues related to the Production Contract's I/R requirements. (LM Reply Ex. BB, Beckwith Dec. ¶¶ 9–12.) The composition of the I/R Board included Phil Beckwith and Charles Brown of DCMA plus members from "Production Ops," Quality Assurance, and Engineering from Lockheed. (LM Reply Ex. DD.) Beckwith stated in his Declaration that he "personally witnessed many of the I/R demonstrations, which is the process by which Lockheed Martin demonstrate[d] that a part or assembly is Interchangeable or Replaceable." (LM Reply Ex. BB, Beckwith Dec. ¶ 13.)

Finally, Lockheed asserts that I/R nonconformances were subject to negotiated contractual agreements. Nethery testified that "the contract had set up provisions for I/R variances and shortfalls and that it was anticipated that this kind of thing probably would happen in the development aircraft and that they had contractual procedures to handle the resolution of it." (CSOF–R Ex. 95, Nethery Dep. 252.) Beckwith, likewise, testified that the production aircraft which were accepted by

the Government from Lockheed Martin "complie[d] with the F–22A Program's contractual and quality requirements, with the exception of those aircraft which are subject to variances, short falls, withholds, and deductions for conditional acceptance, reserving the Government's rights." (Lockheed Reply Ex. BB, Beckwith Dec. ¶ 14.)

Relators respond to this acceptance argument by pointing out that the Sixth Circuit has stated that "[t]he government's inspection and acceptance of a product do not absolve a contractor from liability for fraud under the FCA" when the product, in fact, does not meet the contract's specifications. *Varljen,* 250 F.3d at 430. However, the facts of *Varljen* are distinguishable as to this issue. The quality assurance requirement in *Varljen* required the contractor to produce each batch of gears using the same manufacturing process which had been used to produce the first approved batch of gears. *Id.* at 429. The court found that the contractor's breach of this contractual requirement led to the submission of a false claim even if the gears produced in violation of the contract had the same performance characteristics of gears produced in compliance with the contract. *Id.* at 431. As such, the Government's acceptance of the gears did not preclude liability. *Id.* at 430–31. In this case, Lockheed has produced evidence that it had a process to negotiate variances for I/R nonconformances. The variances were negotiated during the DD–250 acceptance process for each aircraft.

■■■ The burden is on Relators to show that the variance process was not followed or that it resulted in the submission of unreasonable claims for payment. Relators do not meet that burden. Accordingly, the Court grants summary judgment to Lockheed to the extent that Relators have

alleged that Lockheed submitted false claims for payment for aircraft that did not meet I/R requirements. Relators will be permitted at trial to introduce evidence that Lockheed failed to follow quality assurance contractual provisions related to I/R.

#### d. Summary on Claims Based on Nonconforming Tools and Nonconforming Parts

The Court will grant summary judgment to Lockheed on the claims based on allegations that Lockheed submitted false claims based on nonconforming tools and nonconforming parts.

### 3. Government Knowledge of Facts Underlying Alleged FCA Violations as a Defense

■■■ Lockheed contends that Government knowledge of the facts underlying Relators' quality claims is a defense which precludes FCA liability on all of Relators claims based on failure to follow quality assurance requirements. However, Government knowledge is not an absolute defense which precludes liability in all circumstances. "[E]ven the government's knowledge of a fraud does not necessarily absolve a contractor from liability under the FCA." *Varljen,* 250 F.3d at 430. The Sixth Circuit has recognized a Government knowledge defense when the defendant and Government appeared to have agreed to a modified contract. "Government knowledge may negate scienter under the FCA where it is used 'to demonstrate that what the defendant submitted was not actually false but rather conformed to a modified agreement with the Government.'" *U.S. v. Guy,* 257 Fed.Appx. 965, 968 (6th Cir.2007) (quoting *A + Homecare,* 400 F.3d at 455 n. 21).

Courts in other circuits also have recognized that Government knowledge can

thwart the relator's ability to prove the necessary FCA elements of scienter or materiality. "That a defendant has disclosed all the underlying facts to the government may ... show that the defendant had no intent to deceive." *Hagood*, 929 F.2d at 1421; *see also U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 729 (4th Cir. 2010) (internal quotation and citation omitted) ("Evidence that the government officials were aware of any alleged defects and accepted [the defendant contractor's] work anyway effectively negates the fraud or falsity required by the FCA."). Additionally, "where the government and a contractor have been working together to reach a common solution to a problem no FCA claim arises." *U.S. ex rel. Gray v. Lockheed Martin Corp.*, No. 05–4201, 2010 WL 672016, *7–8 (E.D.La. Feb. 19, 2010).

In *U.S. ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818 (7th Cir.2011), the Seventh Circuit granted summary judgment to the defendant contractor because the Government had failed to take action when it learned about the contractor's alleged misrepresentation. *Id.* at 831. "[T]he agency failed to take action when it actually learned of the supposed misrepresentation ... [and] speculative testimony about how that party might have acted if it had discovered that misrepresentation earlier cannot raise a genuine issue of fact as to materiality." *Id.* Similarly, the Fourth Circuit dismissed a count alleging that the defendant misrepresented that it would offer a training contract on firm-fixed-fee basis because the statement "was clearly not material to the DOE's funding decision since the DOE continued with the funding fully aware that the subcontract was let on a cost-plus basis." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 790 n. 12 (4th Cir.1999).

Lockheed repeatedly identifies the practice of using integrated product teams ("IPT") as being key evidence that the Government had knowledge of the tooling issues raised by Relators in this lawsuit. IPTs consisted of Lockheed representatives, plus representatives from the DCMA, the Air Force's system program office, and sometimes from vendors. (Doc. 309–2, Joyner Dep. 15–18.) Individual IPTs existed for manufacturing segments of the building process, such as for engineering, quality, or specific parts of the aircraft. (*Id.*; SOF Ex. 18, Wenzel Dep. 45–46.) IPTs met at regular intervals and as needed to address F–22 issues and problems as they arose. (Doc. 309–2, Joyner Dep. 15–18; SOF Ex. 18, Wenzel Dep. 81.) Charla Wise, the program director for the F–22 program in Fort Worth, testified that "there was an overarching IPT, because government was part of the team, we worked with it day in and day out." (CSOF Ex. 23, Wise Dep. 37.)

Lockheed also contends that the Government was aware of many of the particular problems and contract violations identified by Relators. Specifically, it contends that the corrective action requests issued by DCMA to identify and correct particular problems should not be taken as evidence of liability. Instead, Lockheed states that CARs were evidence that DCMA, or Lockheed itself, had identified potential problems and that the two together were working to find a remedy. Lockheed contends that DCMA's approval of corrective action plans undertaken by Lockheed to remedy CAR violations were a further sign of cooperation. One example of this process is discussed *infra* when DCMA issued a CAR related to modifications to special tooling, but then closed the CAR after approving Lockheed's corrective action plan. (CSOF–R Exs. 160, 161.) Lockheed contends that this evidence negates the FCA claim elements of scienter

(because Lockheed did not act with an intent to submit a false claim) and materiality (because DCMA approved Lockheed's plan to remedy the problem).

More generally, Al Caudell, Lockheed's F–22 tooling manager, testified that "[t]here wasn't hardly anything that [Lockheed] did that Martha Hartley[, the Air Force's system program office manufacturing representative,] wasn't aware of." (CSOF Ex. 17, Caudell Dep. 215.) He also testified that Hartley attended a majority of the weekly tooling review meetings. (*Id.* at 215–16.) Charla Wise testified that the Government had people on the floor in Ft. Worth "on a day-to-day basis, so they could see any issues associated with the aircraft or any part of the program." (SOF Ex. 5, Wise Dep. 65–66; *see also* SOF Ex. 10, Burbage Dep. 127–28; SOF Ex. 20, Riney Dep. 317–18.) She stated further that they were "free to go anywhere on the floor." (SOF Ex. 5, Wise Dep. 66.)

Terry Freeman, the Air Force's quality assurance manager for the F–22 program, said that the Government checked on the F–22 costs twice daily. (SOF Ex. 13, Freeman Dep. 108.) He believed that the Government and Lockheed had a "very nice open working relationship." (*Id.* at 55.) Similarly, Franklin Carey, DCMA's contracting officer, testified that the Government had access to Lockheed's computer system, including purchase orders, billings, and cost reports. (Doc. 309–1, Carey Dep. 115–16.)

■ Relators do not dispute that the Air Force and DCMA had access to the production floor, as well as to purchase orders, billing information, cost reports, and quality data. (Relators' SOF–R 50.) Relators dispute that this evidence concerning the Government's participation with and oversight of the Lockheed F–22 program is sufficient to establish that the Government had knowledge of the specific facts underlying their claims for relief. For example, the evidence suggests that the Government did not know that tool try was eliminated in 1999 until 2001. Moreover, some evidence is set forth above in an early section suggests that Lockheed did not record and maintain sufficient quality data. Government access to Lockheed's quality data could not preclude liability if that data was incomplete.

Finally, the evidence of CARs and corrective action plans can be relevant to the FCA claim elements of scienter and materiality, but that evidence is not dispositive on either element. Government knowledge of fraud does not always negate FCA liability. *Varljen,* 250 F.3d at 430. The Government's approval of a corrective action plan does not change this analysis. "It is clear that a government contracting officer cannot waive compliance with or authorize a contractor to violate federal law or regulation." *U.S. ex rel. Jordan v. Northrop Grumman Corp.,* No. CV 95–2985, 2002 WL 35454612, at *7, 2002 U.S. Dist. LEXIS 26622, at *20 (C.D.Cal. Aug. 5, 2002). A reasonably jury could conclude that the fact that the Government felt compelled to issue a formal written CAR documenting a contract violation is evidence that it perceived the issue to be material. On the other hand, a jury might conclude from the fact that the Government continued to pay claims after issuance of the CAR that the contract violation was not material. Similarly, a jury could view Lockheed's participation in the CAR process as evidence that it was not trying to defraud the Government, but a jury also could view the fact that the Government felt compelled to issue a CAR or a second level CAR as evidence that Lockheed knowingly persisted in the improper conduct.

In sum, the Court finds that it is a question for the jury whether Government

knowledge was sufficient to preclude FCA liability on the remaining subclaims regarding quality assurance requirements.

## B. Claims Based on Improper Purchasing and Billing

### 1. Tool Kits

 Tool kits were groups of tools needed for a specific job on a part, an assembly, or the aircraft. (CSOF Ex. 6, Anderson Dec. ¶ 8; CSOF Ex. 41, Turek Dep. 78.) A vendor called Tools & Metals, Inc. ("TMI") was the sole supplier of tool kits. (CSOF Ex. 41, Turek Dep. 90.) Relators allege that TMI delivered empty or incomplete tool kits. (CSOF Ex. 6, Anderson Aff. ¶ 9; CSOF Ex. 11, Wilson Dec. ¶¶ 37–40; CSOF–R Ex. 148, Anderson Dep. 32–33; CSOF Ex. 186.) Lockheed admitted in a separate lawsuit that "the amounts LMC paid to TMI [were included in] its overhead accounts, a portion of which was reimbursed by the United States." *United States v. Becker,* No. 3:05–cv–627, Dkt. 234 PageID 3793 ¶ 33 (N.D.Tex. May 1, 2009.) Lockheed did not track the value or cost of tool kits because they were not considered to be Government property. (CSOF Ex. 41, Turek Dep. 203.)

Despite this evidence that incomplete tool kits were delivered, Relators cannot prove an FCA claim on this basis. Harold Anderson, who testified that he saw tool kits with missing tools and that he complained to Lockheed about the missing tools, also testified that he was unaware whether TMI billed Lockheed for the cost of a completed tool kit or only for the tools which Lockheed actually received in each kit. (CSOF–R Ex. 148, Anderson Dep. 25–26.) Without evidence that Lockheed was billed for incomplete tool kits, and in turn improperly billed the Government for incomplete tool kits, Relators lack evidence that a false claim was submitted. Lock-

heed is entitled to summary judgment on this issue.

### 2. Improper Pricing and Double Billing of Tooling Subcontract Work

Relators allege that Lockheed accepted improper, excessively high bids for tooling that exceeded its own reasonable cost estimates. Lockheed created a pre-planning analysis (PPA) estimate of what a vendor tool should cost. (CSOF–R ¶ 618.) Vendors provided tooling price approval ("TPA") sheets to Lockheed after they received tooling orders. (CSOF Ex. 28, Haney Dep. 76–78.) If the TPA amount was 110% or under the PPA amount for a tool, it was considered to be fair and reasonable. (CSOF–R ¶¶ 614, 615.) Relators allege, however, that Lockheed accepted TPA bids that were more than 110% PPA and that such action resulted in improper billing. (CSOF Ex. 196.)

 Lockheed admits that it accepted some TPA bids which were more than 110% PPA, but denies the allegation that this was improper. A February 20, 1995 Interdepartmental Communication memo explained that in some cases the comparison of costs in the TPA and the PPA were "apples [ ] bidding against oranges." (CSOF Ex. 196.) The memo explained that the in-house PPA estimates omitted some tasks which were computed into the costs listed in the TPA estimates. (*Id.*) Relators offer no evidence to refute Lockheed's non-fraudulent explanation for the discrepancy.

In another alleged overbilling incident, Relators allege that Mitch Polda, a senior business management analyst, discovered in February 1996 that vendor Aerobotics double billed certain labor hours as both labor and tooling materials and added a 10% handling fee to the materials invoice. (CSOF Ex. 225.) She concluded in April

1996 that Lockheed was overcharged $1,096,376.44 by Aerobotics. (CSOF Ex. 20, Nethery Dep. 14–16.) However, Lockheed investigated Polda's charges and, as a result, debited Aerobotics a total of $469,397.28. (CSOF Ex. 20, Nethery Dep. 14–16.) Relators have not established that Lockheed's investigation or settlement with Aerobotics was unreasonable. Nor have Relators established that Lockheed acted fraudulently in this matter. The Court will grant summary judgment to Lockheed on these allegations.

### 3. Summary of Claims Based on Improper Purchasing and Billing

For the reasons stated above, the Court will grant summary judgment to Lockheed on both subclaims categorized herein as relating to improper purchasing and billing.

## C. Claims Based on Improper Maintenance of Government Property

### 1. Improper Rework of Tooling

Relators allege that Lockheed made modifications to tooling without obtaining the required Government approval. EMD Contract Special Contract Requirement H–034 stated that particular "special tooling and/or special test equipment presently in possession of the contractor and/or subcontractors may be modified as necessary for the performance of this contract with [the DCMA administrative contracting officer's] notification and approval." (Doc. 336 at PageID 29118.) On May 18, 2004, the Government issued Level II CAR # 04–E–03 based on Lockheed's failure to comply with Special Contract Requirement H–034. The Level II CAR explained in relevant part:

> ACO [administrative contractor officer] approval has not been obtained throughout the life of the F/A–22 Program. As an example, after reviewing your CY

2003 Tooling Cost Summary for modifications made to Government–Owned Tools we found in excess of $478K had been charged to the Government for tools that were modified without obtaining ACO approval at the Fort Worth facility. Including Marietta, Palmdale, and various subcontractors, the potential impact for CY 2003 is in excess of $15M.

(CSOF–R Ex. 161.) However, the CAR was closed in August 11, 2005 after a corrective action plan was approved. (CSOF–R Ex. 160.)

██ Material facts remain in dispute. A reasonable jury could conclude that Lockheed violated the FCA if it submitted claims for payment while acting in violation of contractual requirements if the other FCA claim elements are satisfied. *See Midwest Specialties,* 142 F.3d at 302; *Varljen,* 250 F.3d at 430. The Court concluded earlier that the Government knowledge of the issue evidenced by the issuance and closure of a CAR can be evidence either that helps establish or that helps refute the FCA claim elements of scienter and materiality. The Court will deny summary judgment to Lockheed on Relator's claim based on improper rework of tooling without Government approval.

### 2. Improper Scrapping of Tooling

Relators allege that quantities of Government-owned F–22 tooling were disposed of without processing the proper paperwork or following the proper procedures. Relators assert that Jack Turek, a tooling manager for Lockheed, personally directed that tooling be scrapped in violation of protocol and procedures. Michael Sudan, who worked in tooling control for Lockheed, stated that after 1995, Lockheed disposed of tooling based on verbal, handwritten, or typed lists that were issued from Turek's office. (CSOF Ex. 12,

Sudan Dec. ¶¶ 10–12.) He did not see written Government authorizations in the tooling master files as had been the practice before 1995. (*Id.*) Sudan also stated that a large quantity of tooling was disposed of in 2003 or 2004 from tool cribs N and P, but that he never saw written Government authorization for the scrapping. (*Id.*)

However, Sudan admitted at his deposition that he was not required in his position to be provided with the Government authorizations for scrapped tools. (Lockheed Reply Ex. WW, Sudan Dep. 73–77.) Sudan stated that he could not identify by tool number any tools which were scrapped without authorization. (Lockheed Reply Ex. WW, Sudan Dep. 76.) Further, Turek denied creating lists of tools to be scrapped. (CSOF–R Ex. 176, Turek Dep. 119.) He stated that he was not aware of tools being scrapped before tool try or with tool try stickers on them. (CSOF–R Ex. 176, Turek Dep. 119.) Turek denied taking handwritten lists of the scrapped tools from other employees. (CSOF–R Ex. 176, Turek Dep. 220–21.) He and Brian Garrett testified that the Government participated in the tool disposition process through the PCARSS system beginning in 2001 and through a paper system prior to 2001. They testified that the Government approved the scrapping of all tools. (CSOF–R Ex. 169, Garrett Dep. 67, 74, 110; CSOF–R Ex. 176, Turek Dep. 201, 225.)

Additionally, Relator Wilson witnessed more than forty tools being scrapped in the shop area of B–28 in 2003. (CSOF Ex. 52, Wilson Dep. 184–86; CSOF 503.) Wilson thought the circumstances under which they were scrapped were peculiar and suspicious, but he could not state with certainty that Lockheed had violated any contract terms. (CSOF Ex. 52, Wilson Dep. 185–85; CSOF–R Ex. 111, Wilson

Dep. 190–91.) In response, Lockheed relies on Turek's testimony that he had "no knowledge" that "a large stock of project tools in B–28 that [was] scrapped in 2003 or 2004." (CSOF–R Ex. 169, Turek Dep. 224.)

 The Court will grant summary judgment to Lockheed on this subclaim. The testimony of Wilson and Sudan is too speculative to create a material fact dispute. Wilson admitted he only was suspicious that Lockheed violated any contract terms. Sudan admitted that he lacked personal knowledge to assert as fact whether the Government had provided written authorization for the disposal of tooling.

### 3. Storage Claim

Federal Acquisition Regulation 45, in part, required Lockheed to know where a piece of equipment was located, what contract that equipment was identified with, the unit price of that equipment, and whether or not it had been scrapped or otherwise disposed of. *See* 48 C.F.R. 45.505–1. Tool Control at Lockheed had the responsibility "to document the receiving, movement to storage, or using areas, and to track and trace identification of tooling." (CSOF–R ¶ 451.) The FAR applied to all Government-owned property, including tooling. (CSOF–R ¶¶ 444, 445.) Government-owned tools had be properly stored and maintained pursuant to FAR 45.509. (CSOF–R ¶¶ 443, 454.) Lockheed was responsible "for the proper care, maintenance, and use of Government property in its possession or control." 48 C.F.R. § 45.509. If a project tool was set up as a "right to title" the Government got title to the tool as soon as it is completed. (CSOF–R ¶ 445.)

In May 1997, Lockheed completed a Compliance Assessment and Verification Review of its system of internal controls

over the storage of Government property in lieu of DCMA's annual review. Lockheed determined as follows:

> [C]ontrols over the preservation and protection of Government property items in storage were generally adequate. However, controls to ensure that acceptable justification existed for retention of Government property were not adequate to ensure compliance with Federal Acquisition Regulation (FAR), Part 45, and company requirements.

(CSOF Ex. 212.)

In 2004, DCMA issued a written report from a property control system ("PCS") review in which it concluded that Lockheed's property storage system was "[u]nsatisfactory." (CSOF Ex. 302.) DCMA found multiple violations of FAR 45 including problems with the outdoor storage of tools, problems with accessibility of outside storage areas due to growth of vines, grass, and brambles, and the failure to separate Lockheed tooling from Government tooling. (*Id.*) Lockheed developed a corrective action plan in response to the 2004 PCS review which was approved in writing by DCMA in September 2004. (CSOF Ex. 227.) Also, Lockheed eliminated the outdoor storage areas known as boneyards at the Government's request after the PCS review. (CSOF–R ¶ 470.)

DCMA issued a Level II CAR in May 2005 documenting that there had been "three successive DCMA inspections over the past year [highlighting] an apparent systematic and serious re-occurring problem in Tool Control." (CSOF Ex. 213.) The CAR specifically addressed problems with tool cribs. (*Id.*) Lockheed responds that this CAR and the 2004 PCS review are not evidence of an FCA claim, however. It argues that the Government's knowledge of the issue is demonstrated by the existence of the CAR identifying the problem and asking Lockheed to take corrective action. However, the Court has concluded that none of the CARs at issue in this case are dispositive of the elements of scienter or knowledge as to the respective subclaims.

Finally, in a 2008 email, Brian Drummond, a Lockheed tooling engineer, stated his frustration that Lockheed did not have "guidelines requiring protection for stored Program tools owned by the Government." (COSF Ex. 280.) He stated there was "[n]o logic or reason possible for that situation." (*Id.*) Lockheed argues that Drummond was mistaken and points to a written policy entitled "Storing Special Tooling and Special Test Equipment" which contains guidelines on storing tools outdoors. (CSOF–R Ex. 170.) However, this written policy is undated and states "Effective: Draft." (*Id.*) Lockheed has not submitted evidence that this policy was adopted by Lockheed.

The Court will deny summary judgment on this subclaim. Relators have established at least that genuine dispute of material facts exists in regards to whether they can prove a subclaim related to storage of tooling. Lockheed does not dispute that the violation of a FAR can be the basis of an FCA claim, so long as the FAR was material to claim payment. (Doc. 329 at PageID 28510; Doc. 348 at PageID 29566.) The CARs and reports documenting storage problems and insisting on solutions are evidence that a reasonable jury could use to find materiality and scienter, even though Lockheed argues to the contrary.

### 4. Conclusion Regarding Claims Based on Improper Maintenance of Government Property

The Court will deny summary judgment to Lockheed on the subclaims related to the improper rework of tooling and to

storage of tooling, but the Court will grant summary judgment to Lockheed on the subclaim related to the scrapping of tooling.

## V. LOCKHEED'S MOTION FOR SUMMARY JUDGMENT ON RELATORS' FCA RETALIATION CLAIMS

Finally, Lockheed also has moved for summary judgment on Relator Howard's and Relator Wilson's retaliation claims. Relators Howard and Wilson alleged that Lockheed retaliated against them for engaging in conduct protected by the FCA. The FCA creates a cause of action for retaliatory employment discrimination. The statute states in relevant part as follows:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole....

31 U.S.C. § 3730(h) (pre–2009 amendments).

■ In order to establish claims for retaliatory discharge under the FCA, Relators must show as to Relator Howard in Count III and Relator Wilson in Count IV that:

> (1) he engaged in a protected activity; (2) his employer knew that he engaged in the protected activity; and (3) his employer discharged or otherwise discriminated against [him] as a result of the protected activity.

*Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir.2003).

■ For the first prong, the protected activity must relate to "exposing fraud" or "involvement with a false claims disclosure." *McKenzie v. BellSouth Tel., Inc.*, 219 F.3d 508, 516 (6th Cir.2000) (citation omitted). If the protected activity is internal reporting, the reports "must allege fraud on the government." *Id.* It is not enough to assert mere regulatory violations. *Id.* at 516–18. "Although internal reporting of suspected fraud or false claims can form the basis of 'protected activity' under the [FCA], the internal reporting of wrongdoing ... must establish some nexus to the FCA to satisfy the 'in furtherance off' prong of an FCA claim, by reasonably leading to a viable FCA action.'" *Id.* at 517. The FCA retaliation provision protects workers "while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *Mann*, 630 F.3d at 343–44 (citation omitted).

■ As to the second prong, Relators must prove facts "which would demonstrate that defendants had been put on notice that plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government." *Yuhasz*, 341 F.3d at 566 (quoting *U.S. ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir.1996)). The court found the retaliation allegations to be insufficient in *Yuhasz* because the relator, the supervisor of laboratory testing, was acting within the scope of his employment duties when he warned his employer that its conduct violated the FCA. *Id.* at 567–68. His warnings did not put the employer on notice that he was intending to pursue an FCA action. *Id.* The notice to the employer defendant need not explicitly characterize

the plaintiff's concerns as involving false claims against the government, but "there must be some reason for the employer to suspect that the plaintiff was contemplating a *qui tam* action or was assisting the government in an FCA investigation." *Kachaylo v. Brookfield Tp. Bd. of Trs.*, 778 F.Supp.2d 814, 820 (N.D.Ohio 2011).

■■■■ As to the third prong, "[a]n employee must supply sufficient facts from which a reasonable jury could conclude that the employee was discharged [or subjected to a materially adverse employment decision] because of activities which gave the employer reason to believe that the employee was contemplating a *qui tam* action against it." *McKenzie*, 219 F.3d at 517. (citation omitted). In order to prove that the action was taken "because of" the protected activity, the employee must show that the retaliation "was motivated, at least in part, by the employee's engaging in protected activity." *Id.* at 514 n. 4 (quoting S. Rep. no. 99–345 at 35 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5300). Temporal proximity between the protected activity and the retaliatory conduct can be sufficient to permit an inference of causation in limited circumstances. The Sixth Circuit has explained:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir.2008) (finding that a causal connection was established where employee was fired on the same day the boss found out about the protected conduct). The Sixth Circuit reaffirmed in 2010 that "on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but … often evidence in addition to temporal proximity is required to permit the inference." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir.2010). The Sixth Circuit has held that a period of six months between the protected conduct and the retaliatory act is not sufficient to raise an inference of causation. *Nicholson v. City of Clarksville, Tenn.*, 530 F. App'x 434, 447–48 (6th Cir.2013); *see also Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir.1986) (finding four months insufficient).

■■■■ Not every employment decision qualifies as an actionable adverse employment action. "Employment decisions are only materially adverse if they are reasonably likely to deter employees from engaging in activity protected by the False Claims Act." *Boze v. Gen. Elec. Co.*, No. 4:07CV–74–M, 2009 WL 2485394, at *2–3 (W.D.Ky.2009) (internal quotation and citation omitted) (applying Title VII standard to FCA claim). On the other hand, anti-retaliation statutes are not intended to protect against "trivial harms" and are not intended to impose "a general civility code for the American workplace." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

■■■■ Retaliation claims can be based upon "severe or pervasive retaliatory harassment by a supervisor." *Morris v. Oldham Cty. Fiscal Ct.*, 201 F.3d 784, 791–92 (6th Cir.2000). The employer can establish an affirmative defense to a claim of retaliatory harassment by a supervisor by demonstrating "(a) that the employer

exercised reasonable care to prevent and correct promptly any ... harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise." *Id.* (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998)).

 Finally, FCA retaliation claims also can be based on actions taken by non-supervisory co-workers against the plaintiff in appropriate circumstances.[18] *Hawkins v. Anheuser–Busch, Inc.,* 517 F.3d 321, 346 (6th Cir.2008) (Title VII case); *see also Boze,* 2009 WL 2485394, at *3 (applying standard to FCA retaliation cases). The Sixth Circuit held in *Hawkins* as follows:

> [W]e hold that an employer will be liable for the coworker's actions if (1) the coworker's retaliatory conduct is sufficiently severe so as to dissuade a reasonable worker from making or supporting a charge of discrimination, (2) supervisors or members of management have actual or constructive knowledge of the coworker's retaliatory behavior, and (3) supervisors or members of management have condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances.

*Hawkins,* 517 F.3d at 347; *see also Boze,* 2009 WL 2485394, at *3 (applying standard to FCA retaliation cases). The Sixth Circuit holding appears consistent with the recent Supreme Court holding that co-worker harassment is only actionable if the "employer was negligent in failing to prevent the harassment from taking place." *Vance v. Ball State Univ.,* —— U.S. ——, 133 S.Ct. 2434, 2444, 186 L.Ed.2d 565 (2013). "Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant." *Id.*

## A. Retaliation Claim by Wilson

### 1. Protected Conduct

The Court will begin by examining whether Relator Larry Wilson can establish a prima facie case of retaliation. He first must prove that he engaged in protected conduct and that his conduct put Lockheed on notice that he was contemplating an FCA action or assisting the Government with an FCA investigation. *McKenzie,* 219 F.3d at 516–17; *Yuhasz,* 341 F.3d at 566. Wilson admitted that he did not threaten to file a *qui tam* action nor inform Lockheed about his plans to file a *qui tam* action. (SOF–R 169; CSOF Ex. 52, Wilson Dep. 250.)

Wilson set forth several examples of actions he took which he asserts rose to the level of protected conduct. Wilson testified that in or around 1994 he complained both to Lockheed management, including Luther Hudson and Jack Turek, and to union leaders that tooling for the F–22 project should have been performed in-house and not outsourced to vendors. (CSOF Ex. 52, Wilson Dep. 29–30.) Wilson further asserted that he complained that outsourcing of tooling led to a problem with the quality of tooling. (*Id.* at 30–34.) He testified that "I didn't feel like it was fair for the Government to be paying

---

**18.** The Supreme Court recently clarified that at least for Title VII purposes, a supervisor is an employee who is "empowered ... to take tangible employment actions against the vic-tim" such as hiring, firing, or reassignments. *Vance v. Ball State Univ.,* —— U.S. ——, 133 S.Ct. 2434, 2443, 186 L.Ed.2d 565 (2013).

for the quality that they were getting." (*Id.*) Wilson testified that he believed that issues related to the quality of tooling caused by outsourcing were properly grieved under the collective bargaining agreement. (*Id.*) Wilson did not explain in his testimony why Lockheed should have known that Wilson intended to file an FCA action based on the tooling quality issues in addition to grieving the issues.

Relatedly, Wilson and Howard both alleged that in 1995 or 1996 they complained to Ed Phillips and Ron Whillock during a meeting that Lockheed was unfairly outsourcing work to companies run by former Lockheed employees. (CSOF Ex. 52, Wilson Dep. 54–55; CSOF Ex. 11, Wilson Dec. ¶¶ 3, 8; CSOF Ex. 4, Howard Dec. ¶¶ 3, 7.) Wilson testified that he thought that outsourcing work to vendors who were former Lockheed employees was unethical and was subject to grievance under the collective bargaining agreement. (CSOF Ex. 52, Wilson Dep. 30–34.) Whillock responded to their complaint by offering to award work to them as outside vendors if they left Lockheed. (CSOF Ex. 11, Wilson Dec. ¶¶ 3, 8; CSOF Ex. 4, Howard Dec. ¶¶ 3, 7.) Howard responded that he believed that accepting that offer would constitute illegal conduct. (CSOF Ex. 11, Wilson Dec. ¶¶ 3, 8; CSOF Ex. 4, Howard Dec. ¶¶ 3, 7.)

Wilson also asserted that from late 1994 to 1998 he complained to the Air Force about outsourcing quality issues. (CSOF Ex. 52, Wilson Dep. 61–64.) Wilson did not keep a log of when these meetings occurred and he did not take notes during the meetings. (*Id.*) He did not specify the nature of his concern about outsourcing quality. However, Wilson does not cite to any facts indicating that Lockheed was aware that Wilson complained to the Air Force.

Wilson also alleges that he reported concerns about the improper practice of using shop aids as project tools to thirteen specific members of Lockheed management. (CSOF Ex. 11, Wilson Dec. ¶ 33.) Wilson does not specify when he reported his concerns or about which shop tools he was referring.

Lockheed responds that the allegations about outsourcing and the use of shop tools, generally, are insufficient to establish that Wilson engaged in protected activity and/or that Lockheed knew or should have known that he engaged in protected activity. Generalized complaints about wrongdoing are not sufficient to serve as predicate acts for FCA retaliations. Complaints about wrongdoing are not actionable unless they concern fraud or false claims against the Government. *See McKenzie*, 219 F.3d at 516–18. The allegations had to put Lockheed on notice that Wilson was contemplating or assisting with an FCA claim or investigation. *Kachaylo*, 778 F.Supp.2d at 820.

Wilson also stated that he complained that Lockheed engaged in improper billing. He testified at his deposition held on November 2, 2009 that Lockheed engaged in improper billing by "spending a lot of money on a lot of tools that weren't the quality that they should have had or they were paying for tools that weren't needed or that they were building more tools than were required." (Lockheed Reply Ex. VV, Wilson Dep. 241–43.) Wilson identified multiple people to whom he complained, including Mark Grimm, J.Y. Edwards, Travis Smith, Luther Hudson, Dillard Dye, J.C. Carson, Bobby Shepard, and J.R. McClure. (*Id.* at 243–44.) He gave as a specific example that sometime between 2004 and 2009 he complained about vendor-made "hockey stick tools" that were supposed to be made of a hard fiberglass, but were instead rubbery and flexible and

could not "hold I & R." (*Id.*) He testified that the tools had to be made over. (*Id.*) Later, in a written declaration signed on July 6, 2012, Wilson alleged generally that "[s]ince May 1994, I have repeatedly questioned and complained to Lockheed management about Lockheed's improper billing on Government contracts." (CSOF Ex. 11, Wilson Dec. ¶ 3.) He complained to Mark McDonald and Eric Sawyer, tool manufacturing managers, Lynn Stell, Ned Lewindoski, Dave Ledbetter, Steve Critchfield, Jack Turek, Ron Hudson, Eric Sawyer, Ed Phillips, the vice president of manufacturing, Ron Willock, Larry Gable, Joe Carter, and Travis Smith. (*Id.*)

To the extent that Relators contend that Wilson complained about improper billing, Lockheed argues that those allegations also fail to rise to the level of protected conduct because they reasonably could not lead to a viable FCA claim. Wilson has admitted that he had not seen or read the contracts between the Government and Lockheed and was not familiar with the processes or requirements for how Lockheed billed the Government for the F–22. (SOF Ex. 29, Wilson Dep. 144–45, 220, 243.) Lockheed asserts that Wilson's belief that Lockheed was defrauding the Government was not objectively reasonable given his lack of knowledge.

The Court questions whether reasonable jurors could conclude from this evidence that Wilson had engaged in protected conduct and whether Lockheed knew that Wilson had engaged in protected conduct. However, the Court need not decide that issue because Wilson's act of filing this lawsuit was protected activity. LMC was on notice of that protected activity no later than August 2003 when the existence of this action was disclosed by the Government. (Doc. 66 at PageID 672; Doc. 279–21 at PageID 18880.) Nonetheless, Wil-

son's retaliation claim fails because, as explained below, he cannot establish that Lockheed retaliated against him in violation of the FCA because he engaged in protected activity.

### 2. Retaliatory Conduct and Causation

██ Wilson identified a smorgasbord of incidents which he asserts constitutes actionable retaliatory conduct against him, both job-related and not job-related conduct. However, some of his purported evidence lacks specificity, is speculative or based on personal opinion, or is based on inadmissible hearsay.[19] Such evidence will not be addressed in detail. For example, Wilson alleged without providing any specific details that he "had [his] personal vehicles damaged, broken into, and tires slashed while on LMC property." (CSOF Ex. 11, Wilson Dec. ¶ 26.) He did not identify when these incidents happened or who performed the acts. His allegation that he "believe[d]" the acts were retaliatory is speculative. The Court will not find that Lockheed retaliated against Wilson based upon these non-specific and speculative vehicle damage allegations.

Wilson also asserted that Bill Dryden and Jack Arendale threatened him in March 2001 and in early 2003, respectively, by stating that he would be murdered and his body disposed of at a Tennessee farm that Wilson owned. (CSOF Ex. 11, Wilson Dec. ¶ 16.) Wilson asserted that Dryden specifically stated that he would be killed because he had caused Lockheed too much trouble. (*Id.*) That unspecified trouble is as likely to refer to Wilson's union activities against Lockheed as it is to refer to any FCA-protected conduct. Similarly, Wilson asserted that Terry Cagle threatened his life, but he does not give any

---

**19.** Examples are found at CSOF ¶¶ 301, 302, 308, and 311.

reason for Cagle's threats. (CSOF Ex. 11, Wilson Dec. ¶ 10.) Wilson did not identify the position Dryden, Arendale, and Cagle held at Lockheed. The Court does not know whether they were co-workers or supervisors. Moreover, Wilson did not provide evidence connecting these threats of violence to his purported FCA-protected activity.

Turning to job-related actions taken against him, Wilson admitted that he was neither terminated nor demoted from his position. (SOF–R 170.) Wilson, however, alleged that several managers and supervisors threatened in 1998 to terminate him including L.E. Shaffett, the vice-president of labor relations, J.C. Carson, his supervisor, and Steve Critchfield. (CSOF Ex. 11, Wilson Dec. ¶¶ 11, 23.) He stated in his Declaration that these threats were made in retaliation for his complaining about Lockheed's "improper practices[,]" including complaints about Lockheed's "improper billing on Government contracts." (Id. at ¶¶ 3, 11.) However, in his earlier deposition, Wilson testified that he was threatened with termination in 1998 by Shaffett and others because he was filing too many grievances about outsourcing and using union time to investigate and file the grievances. (CSOF Ex. 52, Wilson Dep. 245–47.) He testified that he believed that Lockheed did not want investigations about his grievance allegations, but he admitted that he had not threatened a lawsuit at that time and that he did not know whether Lockheed had any concerns about a lawsuit. (Id. at 250.) Relators may not create a factual dispute about the reason for the threats after Lockheed filed its Motion for Summary Judgment by filing an affidavit which contradicts earlier deposition testimony. See Reid v. Sears Roebuck & Co., 790 F.2d 453, 460 (6th Cir. 1986).

Wilson also states that he was suspended in 2005 pursuant to a zero-tolerance policy following an alleged heated confrontation with another employee. (CSOF Ex. 11, Wilson Dec. ¶ 20.) Wilson asserted that the zero-tolerance policy was not applied evenly by Lockheed, but provides no evidentiary support for that assertion. Likewise, Wilson asserted that Lockheed failed to interview the four witnesses to the event. However, he did not identify the four witnesses, describe how their testimony would have been favorable to him, or explain the basis for his personal knowledge about the extent of Lockheed's investigation. (Id.) The Court cannot conclude this conduct was taken in retaliation for FCA-protected activity based on these non-specific allegations.

Next, Wilson testified that he received his first negative job evaluation in 2006. He grieved the negative review arguing that the review was the result of the complaints about Lockheed's practices. (Id. at ¶ 22.) During the grievance process the negative review was replaced by a positive review. This incident, standing alone, does not constitute a materially adverse employment action.

Wilson also alleged that in 2007 Mark Grimm, his department manager, threatened to fire him and threatened to use his union activities as pretext for the termination. (Id. at ¶ 23.) Again, Wilson did not provide specific evidence linking the negative review or the termination threat to FCA-protected activities.

Wilson also asserted that Lockheed gerrymandered his department by moving employees in and out of the department in an effort to prevent his re-election to union positions. (Id. at ¶¶ 27–28.) However, Wilson did not provide enough specific facts to explain how the actions taken—the alleged transfer of employees in or out of their department(s)—would have had the

effect of turning a union vote against him. He did not provide facts concerning the date of the elections, the positions he sought, nor whether he won or lost the elections. Wilson's conclusory assertions are not sufficient to prove retaliatory conduct. *See Arendale v. City of Memphis,* 519 F.3d 587, 605 (6th Cir.2008) ("Conclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment.")

Finally, as to all of the job-related conduct allegedly taken against him, Wilson cannot rely on temporal proximity alone to raise an inference of causation. Wilson generally asserted that he made complaints over a number of years and that he was harassed in retaliation over a number of years. Wilson did not identify a specific time-frame for many of his activities which he asserted constituted protected conduct. Under Relators' theory, any negative thing that happened to Wilson at work during an approximately ten- to fifteen-year period was FCA retaliation. Causation cannot be proven in this way. Wilson has not established that the purported retaliatory conduct was taken after and in response to his purported protected activity. As to his complaints about outsourcing in the 1990s, and as to the unsealing of the Amended Complaint in 2003, these activities were too remote in time from the purported retaliatory conduct occurring in 2005, 2006, and 2007. *See Nicholson,* 530 Fed.Appx. at 447–48 (stating that temporal proximity of six months was not sufficient standing alone to raise an inference of causation); *Cooper,* 795 F.2d at 1272 (stating that four months was insufficient).

For the foregoing reasons, the Court will grant summary judgment to Lockheed on Wilson's retaliation claim. Wilson has not put forward sufficient evidence to prove that Lockheed took adverse action against him because Lockheed knew Wilson had filed an FCA claim or had assisted with an FCA investigation.

**B. Retaliation Claim by Relator Howard**

**1. Protected Conduct**

Relator Donald Howard raises complaints similar to those made by Relator Wilson. He admittedly did not tell anyone at Lockheed about his intention to file an FCA complaint nor did he threaten to file an FCA complaint. (SOF–R 169.) However, he points to other instances of conduct which he alleges constituted protected conduct.

First, Howard asserted that he complained to Air Force in the early 1990s that outsourcing had caused Lockheed employees to lose jobs. He also complained about the quality of tooling and told the Air Force that Lockheed was doing "too much rework." (SOF Ex. 28, Howard Dep. 34–36.) Howard did not provide any facts indicating that Lockheed knew about these complaints to the Air Force.

Relatedly, Howard also alleged that in 1995 or 1996 he complained to Ed Phillips and Ron Whillock that Lockheed was unfairly outsourcing work to companies run by former Lockheed employees and improperly billing the Government. (CSOF Ex. 4, Howard Dec. ¶¶ 3, 7.) Howard alleged that Whillock responded by offering to award work to them as outside vendors if they left Lockheed. (CSOF Ex. 11, Wilson Dec. ¶¶ 3, 8; CSOF Ex. 4, Howard Dec. ¶¶ 3, 7.) Howard told Whillock that accepting his offer would constitute illegal conduct. (CSOF Ex. 11, Wilson Dec. ¶¶ 3, 8; CSOF Ex. 4, Howard Dec. ¶¶ 3, 7.) Howard alleged that he filed grievances about the outsourcing of tooling work to vendors because it caused Lockheed employees to lose their positions as toolmakers. (SOF Ex. 28, Howard Dep. 17–18.)

Lockheed again responds that the allegations about outsourcing generally are insufficient to establish that Howard engaged in protected activity and/or that Lockheed knew or should have known that he engaged in protected activity. Generalized complaints about wrongdoing are not actionable unless they concern fraud or false claims against the Government. *See McKenzie,* 219 F.3d at 516–18. The allegations had to have been such that they would reasonably put Lockheed on notice that Howard was contemplating or assisting with an FCA claim or investigation. *Kachaylo,* 778 F.Supp.2d at 820.

Howard also asserted that he complained to a large number of specific management employees about "improper billing" starting in 1992 and through his retirement, but he did not explain the nature of the alleged improper billing. (CSOF Ex. 4, Howard Dec. ¶ 3.) Lockheed contends that Howard's purported complaints about improper billing could not objectively be viewed as raising the potential for his bringing an FCA claim because Howard lacked knowledge about the billing process. Howard had not read the contracts between Lockheed and the Government. (SOF Ex. 28, Howard Dep. 48–49.) He did not know the contract's quality requirements. (*Id.* at 120.) He did not know if the EMD contract was described as a design-build contract. (*Id.* at 48–49, 52.) He also did not know the process by which Lockheed submitted claims to the Government. (*Id.* at 56.) He did not know how charges were made to the Government to fix or rework tools or parts that were nonconforming. (*Id.* at 82.) He could not identify any false statements that were used to get claims paid by the Government. (*Id.* at 116.)

More generally, Howard asserted that he complained at some point prior to or during 1998 about Lockheed "subcontracting tooling to unqualified vendors who were making and delivering bad tools." (CSOF Ex. 4, Howard Dec. ¶ 4.) Howard also asserted vaguely that he gave Lockheed auditors "information on bad vendor tooling by Tucker in 1997." (*Id.* at ¶ 3.) He also stated that he complained to Hudson and others about discontinuation of tool try because he believed that discontinuing tool try would lead to bad parts. (SOF Ex. 28, Howard Dep. 86–87.) While complaints about bad tooling might constitute protected conduct in some circumstances, Howard's allegations lack specificity.

Even examining this evidence in a light most favorable to Howard, the Court questions whether reasonable jurors could conclude that Howard engaged in protected conduct and whether Lockheed knew that Howard was taking action in furtherance of an FCA action. Again, the Court need not decide this issue. Howard's act of filing this lawsuit was protected activity. Lockheed was on notice of that protected activity no later than August 2003 when the existence of this action was disclosed by the Government. (Doc. 66 at PageID 672; Doc. 279–21 at PageID 18880.) However, as with Wilson, Howard's retaliation claim must fail because he cannot establish that Lockheed retaliated against him in violation of the FCA because he engaged in protected activity.

## 2. Retaliatory Conduct and Causation

 Howard asserted that similar retaliatory actions were taken against him as allegedly were taken against Wilson. Again, some of the allegations are non-specific and speculative, or are based on inadmissible hearsay, and therefore do not

merit discussion.[20]

Howard believed that Lockheed employees, Moore or Henry, broke into his car and slashed his tires, but he testified at his deposition that they did so because they were "always" mad at him because they "just didn't like me since day one." (SOF Ex. 28, Howard Dep. 125–26.) He also testified that he had no proof that Lockheed managers had "anything to do with" Moore's or Henry's actions. (CSOF–R Ex. 110, Howard Dep. 129–30.) This evidence is insufficient to meet the standard for retaliation based on co-worker harassment under *Hawkins.* 517 F.3d at 347.

Howard also asserted that he was threatened with termination. He alleged that in 1998 L.E. Shaffett, the vice president of labor relations, and Steve Critchfield threatened to terminate him if he did not stop complaining about Lockheed's "improper practices, including subcontracting tooling to unqualified vendors who were making and delivering bad tools." (CSOF Ex. 4, Howard Dec. ¶ 4.) At his earlier deposition, however, Howard explained that Lockheed did not like his complaints about outsourcing tooling, but he agreed that the threat to terminate him "was about too much union time." (SOF Ex. 28, Howard Dep. 121–23.) Howard cannot create a factual dispute about the reasons he was threatened after Lockheed filed its Motion for Summary Judgment by filing an affidavit which contradicts earlier deposition testimony. *See Reid,* 790 F.2d at 460. Howard also asserted that his supervisor threatened to terminate him in 1998. (CSOF Ex. 4, Howard Dec. ¶ 4.) He provided no other details about that incident or evidence connecting it to FCA-protected conduct. Finally, he asserted

that in 2008 Dillard Dye walked up to him with a copy of the complaint in this action in hand and threatened to fire him. (CSOF Ex. 4, Howard Dec. ¶ 19.) However, he testified at his deposition that he retired from Lockheed in February 2005. (Lockheed Reply Ex. AAA, Howard Dep. 11–12.) [21]

Like Wilson, Howard also asserted that Lockheed gerrymandered his department to prevent his re-election to a union position. (CSOF Ex. 4, Howard Dec. ¶ 8.) However, Howard did not provide specific facts to explain how the actions taken—the alleged transfer of employees in or out of Howard's department—had the effect of turning a union vote against him. He provided no facts concerning the date of the elections, the positions he sought, and whether he won or lost the elections. Similarly, Howard alleged that prior to an election in 1996, Lockheed intentionally misplaced several grievances that Howard intended to file so that Howard would be discredited in the election. (*Id.*) Howard also failed to support this allegation with concrete facts.

Howard alleged that Lockheed removed him from the position of committeeman in early 2000 and then surplussed and downgraded him to labor grade 17. (*Id.* ¶ 10.) Again, Howard presented no evidence linking this decision to any protected conduct he took. He did not refute Lockheed's explanation that it was permitted under the terms of the union contract to abolish the position based on the number of employees. (CSOF–R Exs. 120, 121.) Moreover, Lockheed points out that Howard asserted in a grievance filed in response to the abolishment of the committeeman posi-

---

**20.** *See e.g.,* CSOF ¶¶ 300, 313, and 317.

**21.** Relators suggest in a filing that the year "2008" is a typo and that Dye threatened to fire Howard in 2003. (Doc. 318 ¶ 2.) However, Howard has not amended or corrected his Affidavit. His written testimony remains that he was threatened in 2008.

tion that Lockheed eliminated the position based on his age. (CSOF–R Ex. 122.)

In conclusion, Howard's FCA retaliation claim fails as a matter of law. Even if the Court assumes that Howard engaged in conduct protected by the FCA, he has not put forward sufficient evidence for a reasonable jury to conclude that Lockheed took retaliatory conduct against him.

## C. Summary of Retaliation Claims

The Court will grant summary judgment to Lockheed on the claims that Lockheed retaliated against Relators Wilson and Howard in violation of the FCA.

## VI. RELATORS' PARTIAL MOTION FOR SUMMARY JUDGMENT ON LOCKHEED'S AFFIRMATIVE DEFENSES

Relators move for partial summary judgment on the basis that Lockheed cannot prove the Fifth Defense ("laches, waiver, and/or estoppel") or the Eleventh Defense ("accord and satisfaction") asserted in its Answer (Docs. 95, 246) as a matter of law. Lockheed has abandoned its laches defense. (Doc. 266 at PageID 11535.)

## A. Waiver

Lockheed's waiver defense is based upon the theory that the Government's knowledge of the facts and circumstances surrounding the alleged contract violations negate the scienter or materiality elements of an FCA claim. A court in this District in *Roby* denied summary judgment to a plaintiff relator on the defendant contractor's affirmative defense of waiver predicated upon Government knowledge. *Roby*, 100 F.Supp.2d at 642–46. The court determined that disputed material facts precluded summary judgment, but did not

provide an analysis of the pertinent facts. On the other hand, in *Williams*, a district court for the Eastern District of Missouri struck the defendants' affirmative defenses of estoppel and waiver based on government knowledge. 2008 WL 5233028, at *1–2. "Neither does the government waive a defendant's liability for false claims simply due to the government's knowledge of the circumstances." *Id.* at *2.

■■■■ As discussed above in the analysis of Relators' § 3729 claims, courts have recognized that Government knowledge can negate the elements of scienter and materiality. In this case, material disputed facts exist on the issue of whether Government knowledge precluded a finding that Lockheed violated the FCA. The evidence necessary to establish the Government's knowledge of the facts underlying an FCA fraud claim is admissable whether the knowledge defense is viewed as the affirmative defense of waiver or merely as a means to negate the elements of scienter and materiality. The Court will deny summary judgment to Relators as to Lockheed's affirmative defense of waiver.

## B. Estoppel

In the estoppel defense, Lockheed argues that Relators should be estopped from asserting the FCA claims to the extent that the Government would be estopped from asserting the claims. Lockheed cites a decision from the Eleventh Circuit Court of Appeals for the proposition that "[t]he relator stands in the government's shoes—in neither a better nor worse position than the government stands when it brings suit." *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 (11th Cir. 2006).[22]

22. The Eleventh Circuit made this statement to support their holding that a relator was

required to plead an FCA claim with particularity pursuant to Rule 9 of the Federal Rules

 The traditional elements of equitable estoppel are: "(1) misrepresentation by the party against whom estoppel is asserted; (2) reasonable reliance on the misrepresentation by the party asserting estoppel; and (3) detriment to the party asserting estoppel." *Mich. Exp., Inc. v. U.S.*, 374 F.3d 424, 427 (6th Cir.2004) (citation omitted). Estoppel cannot be applied against the Government, however, on the same terms as against other litigants. *Id.* Courts employ a "most strict approach to estoppel claims involving public funds." *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 426, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). The "operation of estoppel against the Government in the context of payment of money from the Treasury could in fact render the Appropriations Clause a nullity." *Id.* at 428, 110 S.Ct. 2465. The Sixth Circuit has applied *Richmond* by stating that "at the very minimum some affirmative misconduct of a government agent is required as a basis of estoppel." *Mich. v. City of Allen Park*, 954 F.2d 1201, 1217 (6th Cir. 1992) (citation omitted). Affirmative misconduct is more than mere negligence; it is "an act by the government that either intentionally or recklessly misleads the claimant." *Mich. Exp.*, 374 F.3d at 427. Lockheed, the party asserting estoppel, bears the burden of proof of proving the intentional act was made with the requisite intent. *Id.*

 Lockheed offers only one ground for finding that the Government engaged in affirmative misconduct. Lockheed contends that if the Court or a jury finds that it violated the FCA by eliminating receiving inspections at the Marietta facility in 1997,[23] then the Government engaged in affirmative misconduct by encouraging and approving of the elimination of the inspections. (Doc. 266 at PageID 11532–35.) The evidence regarding the receiving inspections issue was set forth above in the analysis of Relators' quality assurance-based claims. The Court found that material disputed facts precluded summary judgment on the subclaims based on Lockheed's inspection practices. Likewise, the Court holds that disputed facts preclude summary judgment on the affirmative defense of estoppel.

## C. Accord and Satisfaction

Lockheed's accord and satisfaction defense is based on an argument that the Government released it from the contract claims that are the predicate for the FCA claims. Lockheed cites multiple portions of the Second Amended Complaint for the proposition that Relators' FCA claims are premised upon alleged breaches of contract. (Doc. 40 ¶¶ 2, 81, 88, 91, 118, 125, 299, 328, 387.) The Government Contracting Officer, Thomas Shaffer, released Lockheed from liability on any contract claim when it entered into the Contract Modification No. P00671 to the EMD Contract. (SOF Ex. 2, Riney Dec. ¶ 21 & Ex. B.) The Government and Lockheed agreed in the Contract Modification "that performance of this contract is deemed completed" and they released each other from claims arising under the subject matter of the EMD Contract. (SOF Ex. 2, Riney Dec. Ex. B.) Lockheed contends that because any potential breach of contract claims have been released, liability under the FCA also is precluded.

Lockheed's argument fails. Lockheed acknowledges that a federal law pro-

---

of Civil Procedure just as the Government would be required to plead with particularity. *Id.*

**23.** Lockheed denies that ceasing receiving inspections constituted fraud or supports an FCA claim.

hibits contracting officers from releasing contractors from claims under the FCA. (Doc. 266 at PageID 11539.) One pertinent regulation gives contracting officers the authority to "resolve all claims arising under or relating to a contract[,]" but withholds authority to "settle[ ], compromise, pay[ ] or adjust[ ] any claim involving fraud." 48 C.F.R. § 33.210. In fact, only the Attorney General is authorized to settle FCA claims. 31 U.S.C. § 3730(b). It is undisputed that the Attorney General has not settled the FCA claims here. Accordingly, the contracting officer's settlement and release of the breach of contract claims related to the EMD Contract do not release the FCA claims. Lockheed cannot establish the accord and satisfaction affirmative defense as a matter of law. The Court will grant Relators summary judgment on Lockheed's accord and satisfaction defense.

### D. Summary on Affirmative Defenses

The Court will grant summary judgment to Relators on Lockheed's affirmative defense of accord and satisfaction, but the Court will deny summary judgment to Relators on Lockheed's affirmative defenses of waiver and estoppel.

### VII. CONCLUSION

For the foregoing reasons, Plaintiffs' and Relators' Motion for Partial Summary Judgment (Doc. 249) is **GRANTED IN PART AND DENIED IN PART** and Defendant's Motion for Summary Judgment (Doc. 256) is **GRANTED IN PART AND DENIED IN PART**. Relators' Motion is granted as to the affirmative defense of accord and satisfaction, but denied as to the affirmative defenses of waiver and estoppel. Lockheed's Motion is granted as to failure to follow quality assurance standards claim based on the use of shop aids, the claims based on specific nonconforming tools and nonconforming parts, the claims based on improper purchasing and billing, the improper maintenance of Government property claim based on the improper scrapping of tooling, and the retaliation claims. It is denied as to all other claims.

IT IS SO ORDERED.